536 A.2d 666

**Ronald Lee CASSIDY**

v.

**STATE of Maryland.**

**No. 297, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Feb. 3, 1988.
Certiorari Denied May 31, 1988.

**4**

José Felipé Anderson, Asst. Public Defender (Alan H. Murrell, Public Defender on the brief), Baltimore, for appellant.

Ann E. Singleton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Alexander Williams, Jr., State's Atty. for Prince George's County and Martin Shuham, Asst. State's Atty. for Prince George's County on the brief, Upper Marlboro), for appellee.

Argued before MOYLAN, WILNER, and WEANT, JJ.

MOYLAN, Judge.

The appellant, Ronald Lee Cassidy, was convicted by a Prince George's County jury of child abuse and assault. In addition to two other contentions which it is not necessary for us to consider,[1] the appellant challenges the admissibility of one critical item of hearsay evidence.

For the single item of hearsay in question, the State offers two, or possibly three, theories of admissibility. The two intelligible, albeit unavailing, theories of admissibility are based upon the respective hearsay exceptions of 1) a Statement of Bodily Feelings, Symptoms, and Condition Made to a Consulting Physician for Purposes of Treatment and 2) an Excited Utterance. The third notion advanced by the State may be a third and distinct evidentiary theory; it may, however, be an umbrella term for the first two theories combined; it may, on the other hand, be simply a synonymous reference to the Excited Utterance theory. Our confusion arises from the fact that the State, in this regard, speaks a dead language which neither we nor anybody else understands. The discredited shibboleth *res gestae* is no longer uttered in polite legal society, and we hope to lay its ghost to rest.

### The Facts of this Case

The pertinent facts are few. Indisputably, the two-year-old female victim in this case was physically badly abused. The only issue was whether the appellant was the abuser (or, at least, one of the abusers). The child's mother and the appellant cohabited in Prince George's County. The child referred to the appellant as "Daddy."

---

1. Because we agree with the appellant that evidence was erroneously admitted in contravention of the Hearsay Rule, it is unnecessary to consider the closely related question of whether there might be a violation of the Sixth Amendment's Right to Confrontation even without there being a violation of the evidentiary prohibition of hearsay. *See,* however, *Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978). The appellant's other contention is that the trial judge erroneously refused to admit certain exculpatory statements contained in the medical records of the State's key witness.

The State's case against the appellant, although legally sufficient, was of marginal strength. There was some evidence pointing toward the child's mother as the source of physical abuse. The testimony of the mother, vulnerable to impeachment in several regards, accused the appellant and was virtually the entire case for the State except for the hearsay evidence in issue.

After the child was brought to the Prince George's County General Hospital by a representative of the Child Protective Services, she was examined by Dr. Amie Pullman. The interview took place three days after the abusive conduct in issue. Dr. Pullman observed numerous bruises on the arms, legs, and buttocks. There were also signs of irritation to the genital area. Dr. Pullman also found significant the fact that the child, instead of resisting examination of the vaginal area, took her hands and pulled her labia apart. This, to her, indicated that the child had been sexually molested. Approximately five times during Dr. Pullman's examination of the child, Dr. Pullman asked, "Who did this?" On each occasion, the answer was "Daddy."

For convenience of reference, we will treat the five, virtually *verbatim* repetitions of the hearsay as a single instance. For further convenience of reference, we will treat the combined question, "Who did this?," and answer, "Daddy," as tantamount to the statement, "Daddy did this."

▇ This is a classic instance of hearsay evidence. With peripheral modifications not here pertinent, a good working definition of hearsay is "an out-of-court assertion offered in court for the truth of the matter asserted, and thus resting for its value upon the credibility of the out-of-court asserter." [2] *See generally* C. McCormick, *Law of Evidence* 460

---

**2.** C. McCormick, *Evidence* 729, in its third edition (1984), adopts as its definition of hearsay Federal Rule of Evidence 801, which defines not only "hearsay" proper but also two terms used within that definition:

"(a) Statement. A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

(1st ed. 1954). *And see Houck v. DeBonis,* 38 Md.App. 85, 90, 379 A.2d 765 (1977); *Cain v. State,* 63 Md.App. 227, 232, 492 A.2d 652 (1985). The statement, "Daddy did this," was an out-of-court assertion. The child-victim was never offered as a competent witness and did not testify at the trial. The assertion was made to Dr. Pullman at the Prince George's County General Hospital on May 20, 1986. It was offered in court through the medium of Dr. Pullman's sworn testimony. It was offered, moreover, for the truth of the thing asserted, to wit, that "Daddy did this." It is undisputed that "this" referred to the bruises on the child's body. The evidence also amply supported the finding that "Daddy" referred to the appellant. This evidence was critical in establishing the criminal agency of the appellant.

### The Allocation of the Burden of Proof

In allocating the burden of proof, it is important to begin with the Hearsay Rule itself and not with its converse. The full name of the rule is The Rule *Against* Hearsay. Although subject to multitudinous exceptions, the Rule, in its essence, is a rule of exclusion. The essential thrust of Federal Rule of Evidence 802, for example, is one of exclusion, not of inclusion: "Hearsay is not admissible except as...."

■ The State turns the rule inside out when it argues before us that a two-year-old child would not be likely, or even capable, of fabricating and that the appellant has, therefore, failed to offer any evidence of likely fabrication as a ground for rejecting the hearsay. The burden of production, of course, is upon the proponent, not the oppo-

---

(b) Declarant. A 'declarant' is a person who makes a statement.
(c) Hearsay. 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
That definition is comprehensive enough to include not only an oral assertion but also 1) a writing and 2) nonverbal conduct intended as an assertion. The nuances are beyond the needs of our present analysis and will, for that reason only, not be mentioned further.

**8**

nent. The opponent of hearsay does not have to show why it should be rejected. The fact that it is hearsay is, presumptively, reason enough. The State's statement of the rule seems to be, "Hearsay will be *received,* unless the *opponent* demonstrates its probable *untrustworthiness.*" When urging an exception to a rule of exclusion, however, the burden is upon the proponent of the exception. The correct procedural posture is, "Hearsay will be *excluded,* unless the *proponent* demonstrates its probable *trustworthiness.*" Affirmative evidence of trustworthiness, moreover, contemplates something more than the absence of evidence of untrustworthiness. The likelihood of a motive to speak truthfully requires more than the unlikelihood of a motive to lie. Were it otherwise, the nothing-to-nothing ties on these issues would go to the exception rather than to the rule.

■ The proponent faces a substantive challenge as well as a procedural one. Unlike Federal Rule of Evidence 803(24), which creates a miscellaneous exception to the Hearsay Rule for other "equivalent circumstantial guarantees of trustworthiness,"[3] Maryland, in the common law tradition, is more rigorous and orthodox in its approach to hearsay exceptions. A proponent will not satisfy the rule

---

**3.** Federal Rule of Evidence 803(24) provides:
"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

(24) Other exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

by showing generalized indicia of trustworthiness but must qualify under one of the clearly identifiable and classically recognized exceptions. These are what *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980), refers to as the "firmly rooted hearsay exception[s]."

## Res Gestae

We will deal first with the State's argument that the out-of-court assertions "were admissible under the *res gestae* exception to the hearsay rule." [1] In approaching that

---

4. The State cites as authority for the existence of a *res gestae* exception in Maryland our case of *Moore v. State*, 26 Md.App. 556, 338 A.2d 344 (1975). In that case, to be sure, we deemed an out-of-court assertion by a three-and-a-half-year-old child-abuse victim, made to a treating physician and identifying the person who assaulted her ("Daddy did it."), to have been admissible as an exception to the Rule Against Hearsay. We were careful, however, to treat it as an Excited Utterance. We scrupulously disdained any reliance on the notion of *res gestae:*

> "We hold, however, that the out-of-court declaration was admissible in evidence upon a well-recognized and long-established exception to the Hearsay Rule—as an excited utterance which is a variety of the broader category known as spontaneous declarations.[1]
>
> [1] In this case, we will not rely upon the undifferentiated phrase *res gestae*, because that umbrella term covers a wide variety of analytically distinct rationales, including excited utterances; declarations of both present bodily condition and present mental condition (if contemporaneous with the event in issue); declarations of present sense impression (if contemporaneous with the event in issue); either admissions by a party or declarations against interest (again, if contemporaneous with the event in issue); and utterances (or verbal acts) which are themselves operative conduct or utterances which are a part of relevant conduct, which latter categories are, of course, non-hearsay rather than exceptions to the Hearsay Rule. Events do not speak; only people do, and they may speak truthfully for a variety of reasons. In the case of non-hearsay, it doesn't matter whether they speak truthfully or not. We do not by any means imply that trial courts using the broader term are in error. A right ruling is a right ruling, however undifferentiated the articulation of its rationale. We deem it our function, however, at least to make the effort to be analytically precise."

26 Md.App. at 560, 338 A.2d 344. *And see* Moylan, *Res Gestae, or Why Is That Event Speaking and What Is It Doing in This Courtroom?*, 63 A.B.A.J. 968 (1977).

Hydra-headed doctrinal monster, one would do well to arm himself initially with the wisdom of Dean Wigmore:

"The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth. There are words enough to describe the rules of Evidence. Even if there were no accepted name for one or another doctrine, any name would be preferable to an empty phrase so encouraging to looseness of thinking and uncertainty of decision."

6 J. Wigmore, *Evidence* § 1767, at 182 (3d ed. 1940). Professor Morgan was equally vehement in his denunciation of this pearl of imprecision:

"The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as *'res gestae.'* It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking. Certain it is that since its introduction at the close of the eighteenth century, on account of its exasperating indefiniteness it has done nothing but bewilder and perplex."

Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229 (1922). Briefer but equally damning was the characterization attributed to Judge (later Supreme Court Justice) Holmes by James Bradley Thayer:

"The man that uses that phrase (res gestae) shows that he has lost temporarily all power of analyzing ideas. For my part, I prefer to give articulate reasons for my decisions."

Equally to the point was Judge Learned Hand in *United States v. Matot*, 146 F.2d 197, 198 (2d Cir.1944):

"[A]s for 'res gestae' ... if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms."

C. McCormick, *Evidence* (3d ed. 1984) [hereinafter cited as *McCormick*], even while rejecting *res gestae* as an outmoded concept, is kindlier in its treatment of the term. It points out that the term came into common usage in the early 1800's and that at "this time the theory of hearsay was not well developed, and the various exceptions to the hearsay rule were not clearly defined. In this context, the phrase *res gestae* served as a convenient vehicle for escape from the hearsay rule in two primary situations." *Id.* at 835. Professor Thayer referred to the phrase's "convenient obscurity" and stressed its utility, at a time before analysis reached its present level of sophistication, as a handy "catch-all":

"It would seem probable that it was called into use mainly on account of its 'convenient obscurity.' ... The law of hearsay at that time was quite unsettled; lawyers and judges seem to have caught at the term 'res gesta,'—... which was a foreign term, a little vague in its application, and yet in some applications of it precise,— they seem to have caught at this expression as one that gave them relief at a pinch. They could not, in the stress of business, stop to analyze minutely; this valuable phrase did for them what the limbo of the theologians did for them, what a 'catch-all' does for a busy housekeeper or an untidy one,—some things belonged there, other things might for purposes of present convenience be put there. We have seen that the singular form of phrase soon began to give place to the plural; this made it considerably more convenient; whatever multiplied its

ambiguity, multiplied its capacity; it was a larger 'catch-all.' "

Thayer, *Bedingfield's Case—Declarations as a Part of the Res Gesta*, 15 Am.L.Rev. 1, 9–10 (1881).

In *Gray v. State*, 53 Md.App. 699, 456 A.2d 1290 (1983), we ourselves, even while repudiating *res gestae*, spoke wistfully of its sometimes comforting ambiguity:

> "One almost longs nostalgically for the discredited label of 'res gestae,' notwithstanding its utter repudiation in polite academic circles. Its sin was its elusive ambiguity. Ironically, that ambiguity may also have been its occasional virtue.
>
> . . . . .
>
> [S]ometimes the shibboleth was an easy way for a practical-minded court to say, 'We frankly can't figure out whether the statement is admissible under Theory A or Theory B, but we don't really care because it is admissible in either event.' " (Footnote omitted).

53 Md.App. at 710–711, 712, 456 A.2d 1290.

In any event, the protean term *res gestae* appeared, as recognized by both *Wigmore* and *McCormick*, in at least seven different manifestations. Three of these were instances. of nonhearsay. "In the first [large category], it was used to explain the admissibility of statements that were not hearsay at all." *McCormick*, at 835. These instances were:

1. *Verbal Acts:* This refers to utterances—verbal conduct—to which the law attaches duties and liabilities. Examples are such things as the offer and acceptance of an oral contract, the uttering of a slander, and the making of a false or deceptive representation.[5]

---

5. *See McCormick, supra,* at 732–733; 6 J. Wigmore, *Evidence* § 1770, at 259–266 (Chadbourn rev. 1976) [hereinafter cited as 6 *Wigmore*]; L. McLain, *Maryland Evidence,* § 801.7, at 278–280 (1987); *Arundel Corp. v. Jasper,* 219 Md. 519, 530–531, 150 A.2d 415, 421 (1959); *Little v. State,* 204 Md. 518, 522–523, 105 A.2d 501, 503 (1954); *Phillips v. Haugaard,* 135 Md. 427, 431–433, 109 A. 95, 96–97 (1919).

2. *Verbal Parts of Acts:* These are utterances accompanying a legally significant act, sometimes explaining or giving character to a transaction that might otherwise be ambiguous. Examples would include words explaining whether a transfer of money was a gift, a loan, a repayment of a debt, a bribe, etc.; the words, "Your money or your life," in an armed robbery context or the words, "Don't scream or I'll kill you," in a kidnapping context.[6]

3. *Implied Assertions:* The phrase is *McCormick's*. *Wigmore* refers to the phenomenon as "utterances used circumstantially, as giving rise to indirect inferences, but not as assertions to prove the matter asserted." *McCormick* cites as examples such statements as, "I have been happier in New York than in any other place," when offered to show the speaker's intent to remain in New York or, "My husband is a detestable wretch," offered to show lack of affection for the husband.[7]

The protean term *res gestae* also embraced four exceptions to the Rule Against Hearsay, which four exceptions constitute the category or family known as "Spontaneous Statements." This ability of the phrase *res gestae* to move freely from cases of nonhearsay to very different cases where the utterances were hearsay qualifying as exceptions to the Rule was what caused us to remark in *Gray v. State, supra,* at 53 Md.App. 712, 456 A.2d 1290:

"The splendid utility of the maligned phrase, of course, arose from the fact that it referred to a blurred boundary, the misty border zone between instances of the

---

**6.** *See McCormick, supra,* at 733; 6 *Wigmore, supra,* §§ 1772–1786, at 267–313; *Maryland Evidence, supra,* § 801.8, at 280; *Brooks v. Mitchell,* 163 Md. 1, 161 A. 261 (1932).

**7.** *See McCormick, supra,* at 740–741 and 836–837; 6 *Wigmore, supra,* §§ 1788–1792, at 313–327; *Maryland Evidence, supra,* § 801.10, at 282–284.

**14**

hearsay rule inapplicable and instances of the hearsay rule satisfied." (Footnote omitted).

The four instances of the Hearsay Rule satisfied, which were once covered by the phrase *res gestae* are:

4. *Statements of Present Bodily Condition:* Embraced within this exception are the closely related, although not coterminous, phenomena of 1) statements to physicians consulted for treatment and 2) statements to physicians employed only to testify.[8]

5. *Statements of Mental State:* Embraced within this exception are the closely related phenomena of 1) statements of present mental or emotional state to show a state of mind or emotion in issue; 2) statements of intention offered to show subsequent acts of declarant; and 3) statements of state of mind to show memory or belief as proof of previous happenings.[9]

6. *Excited Utterances.*[10]

7. *Unexcited Statements of Present Sense Impressions.*[11]

---

8. *McCormick, supra,* at 838–842; J. Weinstein & M. Berger, *Evidence* ¶ 803(3)[01], at 803–103 through 803–106 (1984) [hereinafter cited as *Weinstein's Evidence*]; *Maryland Evidence, supra,* §§ 803(3).2 and 803(4), at 363–364 and 367–369; *Pennsylvania Railroad Co. v. Simmons,* 159 Md. 114, 121, 150 A. 263, 265–266 (1930); *Commissioners of Delmar v. Venables,* 125 Md. 471, 479–480, 94 A. 89, 92–93 (1915); *Geiselman v. Schmidt,* 106 Md. 580, 584, 68 A. 202, 204 (1907); *Robinson v. Lewis,* 20 Md.App. 710, 711–712, 717, 317 A.2d 854, 856, 858 (1974).

9. *McCormick, supra,* at 842–854; *Weinstein's Evidence, supra,* ¶¶ 803(3)[02]–803(3)[05], at 803–106 through 803–137; *Maryland Evidence, supra,* § 803(3).1, at 356–363; *Santoni v. Moodie,* 53 Md.App. 129, 140–151, 452 A.2d 1223, 1229–1234 (1982).

10. *McCormick, supra,* at 854–859; *Weinstein's Evidence, supra,* ¶ 803(2)[01], at 803–85 through 803–96; *Maryland Evidence, supra,* § 803(2).1, at 349–352; *Mouzone v. State,* 294 Md. 692, 452 A.2d 661 (1982); *Moore v. State,* 26 Md.App. 556, 338 A.2d 344 (1975).

11. *McCormick, supra,* at 860–863; *Weinstein's Evidence, supra,* ¶ 803(1)[01], at 803–71 through 803–81; *Maryland Evidence, supra,* § 803(1).1, 343–346; *Booth v. State,* 306 Md. 313, 508 A.2d 976 (1986); *Booth v. State,* 62 Md.App. 26, 31–37, 488 A.2d 195 (1985); Waltz, *The*

Once analysis began to become more sophisticated, the common denominator rationales linking to some extent these various ways of determining that the Rule Against Hearsay was not offended, were recognized as being contemporaneity and spontaneity. Both Professor Thayer and Professor Morgan favored contemporaneity as the primary *raison d'être*. Dean Wigmore, on the other hand, strongly favored spontaneity as the operative rationale. Some of these instances of admissibility are predicated upon the one and some, upon the other. Their shifting fortunes have sometimes been a function of whether the Thayer–Morgan explanation or the Wigmore explanation was in the ascendant.

■ What is now clear, however, is that all of these instances of admissibility are capable of being analyzed on their own terms and do not need to huddle under the undifferentiated umbrella of *res gestae*. "The phrase has nothing to entitle itself ... to preservation. It has had various uses. But it is ambiguous and unmanageable in all of them. The doctrines to which it has been applied possess, all of them, a right to existence under well-recognized preexisting principles and can be explained without a resort to this phrase. No more can be said for it than that it was once much used in the course of the development of some important aspects of two of these doctrines." 6 *Wigmore, supra,* at 253. Whatever could be analyzed under one or another of the forms of *res gestae* can now be analyzed more cleanly in a water-tight compartment of its own. The phrase *res gestae* had its day but that day is done. An appropriate obituary was pronounced by *McCormick, supra,* at 836:

"Historically, however, the phrase served its purpose. Its very vagueness made it easier for courts to broaden its coverage and thus provide for the admissibility of certain statements in new situations. But the law has

**16**

now reached a stage at which widening admissibility will be best served by other means. The ancient phrase can well be jettisoned, with due acknowledgment that it served its era in the evolution of evidence law."

## The Excited Utterance Exception

At the appellate level, although not at the trial level, the State urges the admissibility of the out-of-court assertion, "Daddy did this," as an Excited Utterance. The Excited Utterance Exception to the Rule Against Hearsay is so settled in the law of Maryland as to require no extended analysis here. Even while still adhering to the older linguistic usage of *res gestae*, Maryland firmly endorsed the principle of the Excited Utterance Exception to the Hearsay Rule in numerous cases. *Wright v. State*, 88 Md. 705, 41 A. 1060 (1898); *Baltimore City P.R. Co. v. Tanner*, 90 Md. 315, 45 A. 188 (1900); *Neusbaum v. State*, 156 Md. 149, 143 A. 872 (1928); *Montgomery Bus Lines Co. v. Diehl*, 158 Md. 233, 148 A. 453 (1930); *Tittlebaum v. Pennsylvania R. Co.*, 167 Md. 397, 174 A. 89 (1934); *Grier v. Rosenberg*, 213 Md. 248, 131 A.2d 737 (1957); *Stevens v. State*, 232 Md. 33, 192 A.2d 73 (1963); *Reckard v. State*, 2 Md.App. 312, 234 A.2d 630 (1967); *Hicks v. State*, 3 Md.App. 225, 238 A.2d 577 (1968); *Price v. State*, 5 Md.App. 127, 245 A.2d 600 (1968); *Hall v. State*, 5 Md.App. 599, 249 A.2d 217 (1969); *Smith v. State*, 6 Md.App. 581, 252 A.2d 277 (1969).

In *Estep v. State*, 14 Md.App. 53, 65–70, 286 A.2d 187 (1972), Judge (now Chief Judge) Gilbert synthesized numerous cases dealing with the Excited Utterance Exception, especially cases where the excited declarant had been the victim of a sexual attack. In three relatively recent cases, we have dealt specifically with the Excited Utterance Exception in situations involving young children who had been victims of child abuse and/or sexual assault. *Moore v. State*, 26 Md.App. 556, 338 A.2d 344 (1975); *Jackson v. State*, 31 Md.App. 332, 356 A.2d 299 (1976); *Deloso v. State*, 37 Md.App. 101, 376 A.2d 873 (1977).

The essential rationale for the Excited Utterance Exception is spontaneity arising immediately from the exciting event and not yet having abated when the utterance is made. *McCormick, supra,* explains it simply, at 854–855:

"First, there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer. Second, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought."

An obvious factor in determining the continuing presence of the exciting influence is the time factor. *McCormick* analyzes this factor, at 856:

"Probably the most important of the many factors entering into this determination is the time factor. If the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement. But as the time between the event and the statement increases, so does the reluctance to find the statement an excited utterance. Although one court has held a statement made fourteen hours after a physical beating to be the product of the excitement caused by the beating, other courts have held statements made within minutes of the event not admissible. Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotional upset will often suffice." (Footnotes omitted).

In *Moore v. State, supra,* a three-and-a-half-year-old child-abuse victim asserted, in answer to questions from a treating physician in an emergency room, that "Daddy was mad; Daddy did it." The child was "in acute distress and suffering significant pain" and his assertion was made

"within hours after the inflicting of massive injuries." 26 Md.App. at 566, 338 A.2d 344. We upheld the decision of the trial judge to admit the assertion as an Excited Utterance. In *Jackson v. State, supra,* a four-year-old victim of statutory rape asserted to her mother, after coming into the house obviously distraught, that "Kino done it to me." The child was bleeding from the vagina and crying. The assertion occurred minutes after the sexual assault. We upheld the decision of the trial judge to admit the assertion as an Excited Utterance.

By way of contrast, in *Deloso v. State, supra,* we reversed the trial court for admitting as Excited Utterances assertions on two occasions by a five-year-old child-abuse victim to the director of her school and other school personnel that her father "had hit her on the back, because she had disobeyed him" and that "her father hit her with a belt and pushed or threw her against the wall." The primary reason for the reversal was the procedural failure of the State, as the proponent of the hearsay, to carry its burden to establish the qualifying criteria:

"Implicit in this consideration, however, is the requirement that the offerer of the hearsay statements provide the foundation upon which he asserts admissibility. See *Harnish, supra,* 9 Md.App. at 549–551 [266 A.2d 364]; McCormick, *Evidence* § 297 (2d ed.). As we have already pointed out, the State's entire case rested upon hearsay, but the State laid no foundation showing circumstantial probability of trustworthiness. Nor was there evidence of the relative time sequences between the alleged incidents of abuse and Jenny Jo's statements to the various witnesses. Nothing in the evidence indicated that Jenny Jo 'was still emotionally engulfed by the situation,' either inferentially from time and circumstances, or actually from the witnesses' observations."

37 Md.App. at 106–107, 376 A.2d 873.

Although the State urges on appeal that the out-of-court assertion, "Daddy did this," should have been admissible as an Excited Utterance, that theory of admissibility was not

presented to the trial court. The State's effort before us to sustain the admissibility of the hearsay on that theory fails for four distinct reasons, any one of which would be fatal to the State's argument.

1. *The Failure of the Trial Court to Make Factual Findings in This Regard:*

 It would be quite possible, of course, for a ruling on admissibility to be sustained on one ground even if the trial court had rested its decision on a very different ground. A ruling may be right for the wrong reason. When the alternative ground offered is that of the Excited Utterance Exception to the Hearsay Rule, however, it is required that there be findings of predicate fact. Unless the evidence is so clear and decisive as to compel such findings as a matter of law, an actual finding of fact would be required that there had been a dramatic incident sufficient to generate the requisite excitement. Additionally, an actual finding of fact would be required that the declarant at the time of the utterance was still in the throes of the exciting event and was not capable of reflective narration. For the obvious reason that the trial judge was never called upon to make such findings, no findings in this regard were ever made. At least in the absence of evidence so clear, decisive, and overwhelming as to compel such findings, it is not for us to make them *de novo.*

2. *The Procedural Failure of the State to Meet Its Burden of Production:*

 Closely related to the foregoing failure but possessing some autonomous morbidity of its own was the failure of the State, as the proponent of the evidence, to meet its burden of production to satisfy this theory of admissibility. The State offered no evidence to show that the two-year-old declarant was in an excited condition at the time of the out-of-court assertion in issue. The State simply offers, in argument, the speculative possibility that the declarant, "due to her age and the nature of the incident could well

have still been emotionally engulfed by the situation even two or three days after the crime." This clearly does not satisfy the procedural requirement, spelled out in *Deloso v. State, supra,* that "the offerer of the hearsay statements provide the foundation upon which he asserts admissibility." 37 Md.App. at 106, 376 A.2d 873. Here, as in *Deloso,* "the State laid no foundation showing circumstantial probability of trustworthiness." *Id.* *Deloso* is, therefore, dispositive.

### 3. *The Time Lapse:*

█ The evidence actually adduced that might bear on the excited quality of the utterance, far from compelling findings in the State's favor, may well have been so clear, decisive, and overwhelming in the opposite direction as to negate the possibility of an Excited Utterance as a matter of law. Although such a holding is unnecessary because of the failure of the hearsay to qualify in other regards, some comment is appropriate at least by way of instructive *dicta.*

All of the cases we have reviewed, in the treatises and in the Maryland case law, have analyzed the time lapse in units of minutes and hours, never in units of days. In this case, the time lapse was three days. Although the reported decisions eschew arbitrary and mathematical time limits in favor of *ad hoc* determinations of the continuing influence of the exciting event, there are obvious outer limits.

In terms of the continuing influence of the exciting event, Maryland went about as far as any of the states have gone in the case of *Smith v. State,* 6 Md.App. 581, 252 A.2d 277 (1969). Although that decision still used the obsolete language of *res gestae,* it clearly dealt with the phenomenon of the Excited Utterance. A four-year-old victim of a sexual assault recounted the incident and identified her assailant to her mother some four-and-a-half to five hours after the incident. We affirmed the ruling of the trial court that the assertion was an Excited Utterance. In the Comment, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases,* 83 Col.L.Rev. 1745, 1759 (1983), the

commentator seized upon *Smith v. State, supra,* as illustrating the outer limit to which the Excited Utterance Exception has been pushed and, indeed, criticized the decision for having arguably overstepped that outer limit:

> "[I]n *Smith v. State,* the Maryland Court of Special Appeals admitted the hearsay statement of a four-year-old rape victim despite the fact that four-and-one-half to five hours had elapsed before she spoke to her mother about the incident. The court ignored the fact that the child was calm at the hospital, hours before she made her statement, and that at trial, the examining doctor had characterized the child's demeanor as 'placid.'

> However, in avoiding the harsh results of the spontaneous exclamation exception in this manner, courts have virtually destroyed the integrity of the exception, stretching it far beyond its traditional bounds, and creating much uncertainty in its application. What courts are in fact doing is looking to various circumstantial guarantees of trustworthiness, of which spontaneity is just one." (Footnotes omitted).

Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations,* 98 Harv.L. Rev. 806, 811 n. 36 (1985), also refers to *Smith v. State, supra,* as an example of state courts' both having "extended the allowable time lapse in cases of child sex abuse" and "straining the rationale of the excited utterance exception." Our point is that four-and-a-half to five hours seems to represent the extreme outer limit to which the Excited Utterance phenomenon has been pushed. In the present case, the out-of-court assertion, "Daddy did this," came three days after the assault in issue. Although in dealing with factual questions it is discreet never to say, "Never," it is difficult to conceive of circumstances under which excited spontaneity could continue to operate over such a protracted time frame.

### 4. *The Fact of Excited Spontaneity:*

█ Even within the shortest of time lapses, moreover, it is required that the out-of-court assertion actually be spon-

taneous, to wit, that the declarant literally still be in the throes of the exciting event.

In dealing at least with sexual assaults inflicted by family members on young children, the Excited Utterance does not generally appear to be a good candidate for qualifying out-of-court assertions. As the Comment, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases, supra,* notes, at 1756–1757:

"This emphasis on spontaneity is improper for two reasons. First, most children do not view a sexual episode as shocking or even as particularly unusual. Children thus often do not recount the event with the shock or emotion required under the exception. Children are simply not as highly sexualized or moralized as adults. They may not know what has happened to them is wrong. This may be especially true if the child has been involved in an incestuous relationship. A parental imprimatur on the entire situation may often cause the child to view everything as normal....

This childhood perspective on sexual experiences naturally does not produce the shock or excitement that the law presumes to exist after such an event. Quite often, the incident is related as part of the days activities without any indication from the child that it was traumatic or unusual."

Necessary or not, we do not hesitate to hold that the only evidence bearing on the state of mind of the two-year-old declarant in this case clearly, decisively, and overwhelmingly established that her assertion was not the spontaneous product of excitement. She had been in the presence of Dr. Pullman, off and on, for a period of eight hours, three days after the assault in issue. The assertions were not spontaneous but were given in response to questions posed by Dr. Pullman. When Dr. Pullman was asked about the demeanor of the child, she responded:

"The Witness: The child was actually extremely cooperative. More cooperative than we ordinarily find a two-year-old. I don't know what her understanding of the

situation was, but she was very unusually friendly and cooperative. During the whole procedure she was friendly. She readily went to all of the different strangers in the emergency room, played with them, sat with them, let them hold her, let them pick her up.

The Court: So she did not appear frightened in the setting of the hospital and the hospital staff?

The Witness: She was abnormally not frightened. It was aberrant how unfrightened she was."

In terms of the presence or absence of excitement or hysteria, Dr. Pullman was unequivocal:

"The Witness: The child was two years old. She never asked for her mother. She never cried. She never got hysterical. She just happily went about her business from one person to the next."

Again, we find *Deloso v. State, supra,* instructive, at 37 Md.App. 107, 376 A.2d 873:

"Jenny Jo's conduct and conversation appeared from the telling to have been quite casual—almost a 'show and tell' depiction. Neither *Moore, Jackson,* nor any other case reviewed by this Court permits the admission of the hearsay of a child simply by virtue of its tender years. The element of trustworthiness is generally found in the spontaneity of the exclamation, and that is totally lacking here."

For all or any of the above reasons, the out-of-court assertion, "Daddy did this," was not remotely an Excited Utterance.

### Statements of Then–Existing Physical Condition: Generally

Because statements to a treating physician (and sometimes even to a non-treating physician), as an exception to the Rule Against Hearsay, grew out of the parent exception of Statements of Then–Existing Bodily Condition, an understanding of the parent exception will shed light on the affiliated exception that evolved from it. The parent excep-

tion is labeled by *McCormick, supra,* as "Statements of Bodily Feelings, Symptoms, and Condition." It is a member of the larger family of hearsay exceptions known as "Spontaneous Statements." 6 *Wigmore, supra,* § 1718 traces the origins of "Statements of a Physical Condition" to as early as 1678 and points out that "[i]t is for statements of physical pain or suffering that the exception has been longest recognized and the principle most fully and clearly reasoned out." *Id.* at 101, 376 A.2d 873. The statement, to be admissible, had to be of a physical feeling then being experienced. Its reliability rested on its spontaneity. As *McCormick, supra,* pointed out, at 838:

> "Special reliability is considered to be furnished by the spontaneous quality of the declarations, assured by the requirement that the declaration purport to describe a condition presently existing at the time of the statement." (Footnote omitted).

Declarations of existing bodily condition were not required to be made to a physician in order to qualify as a hearsay exception; any person who heard the statement could testify to it. *Geiselman v. Schmidt,* 106 Md. 580, 584, 68 A. 202, 204 (1907) (no error in permitting plaintiff's wife to testify that he complained of suffering from his injuries); *Pennsylvania R.R. v. Simmons,* 159 Md. 114, 121, 150 A. 263, 265–266 (1930) (proper to allow a relative to testify that while plaintiff was bedridden she complained of headaches); *Robinson v. Lewis,* 20 Md.App. 710, 711–712, 717, 317 A.2d 854, 856, 858 (1974) (reversible error to exclude testimony of son that the deceased had complained of pain in his legs during the period following the accident until his death), *aff'd per curiam,* 273 Md. 725 (1975). Because of the requirement of spontaneity, however, there were limitations upon the exception:

> "The exception is, however, limited to descriptions of present condition, and therefore excludes description of past pain or symptoms as well as accounts of the events furnishing the cause of the condition." (Footnotes omitted).

*McCormick, supra,* at 838–839. *McCeney v. Duvall,* 21 Md. 166, 182–183 (1864) (statements as to how long declarant had been suffering from disease were inadmissible). Maryland has long recognized this general exception. *Sellman v. Wheeler,* 95 Md. 751, 754, 54 A. 512, 514 (1902); *Maryland Evidence, supra,* § 803(3).2, at 363–364.

### *Statements to Physicians Consulted for Treatment*

The evidentiary phenomenon of a Statement to a Treating Physician was a natural outgrowth of the more general phenomenon of a Statement of Then-Existing Physical Condition. Under the special circumstances of the more limited phenomenon, there was a trade-off. Qualifying restrictions were loosened in some regards but correspondingly tightened in other regards.

Because of the additional guarantee of trustworthiness, even jurisdictions that were loathe to recognize the general exception readily admitted the Statement of Then–Existing Bodily Condition Made to a Treating Physician:

"Statements of a presently existing bodily condition made by a patient to a doctor consulted for treatment have almost universally been admitted as evidence of the facts stated, and even courts greatly limiting the admissibility of declarations of bodily condition generally have admitted statements made under these circumstances. Although statements to physicians are not likely to be entirely spontaneous, since they are usually made in response to questions, their reliability is assured by the likelihood that the patient believes that the effectiveness of the treatment he receives may depend largely upon the accuracy of the information he provides the physician." (Footnotes omitted).

*McCormick, supra,* at 839. The spontaneity requirement was lessened because of the alternative assurance of reliability.

Because of that alternative guarantee of reliability, the exception for the case of the treating physician generally

expanded to include statements of past symptoms as well as then-existing pain or feeling:

"Because of this strong assurance of reliability courts tend to expand the exception to include statements made by a patient to a physician concerning *past* symptoms. This seems appropriate, as patients are likely to recognize the importance to their treatment of accurate statements as to past as well as present symptoms." (Footnote omitted). (Emphasis in original).

*Id.* at 839–840.

The final and logical expansion of the exception for the case of the treating physician was to include statements, pertinent to the course of treatment, as to the cause or source of the bodily condition:

"The exception may be taken one step further to encompass statements made to a physician concerning the cause or the external source of the condition to be treated. In some cases the special assurance of reliability— the patient's belief that accuracy is essential to effective treatment—also applies to statements concerning the cause, and a physician who views this as related to diagnosis and treatment might reasonably be expected to communicate this to the patient and perhaps take other steps to assure a reliable response." (Footnote omitted).

*Id.* at 840. *Fisher Body Div. v. Alston,* 252 Md. 51, 54–55, 249 A.2d 130, 132–133 (1969); *Riddle v. Dickens,* 241 Md. 579, 581, 217 A.2d 304, 306 (1966).

Whether dealing with existing bodily feelings, past symptoms, or medical history as to the cause or source of the bodily condition, the guarantee of trustworthiness was precisely the same. Spontaneity was no longer the guarantee. The guarantee, rather, was that no one would willingly risk medical injury from improper treatment by withholding necessary data or furnishing false data to the physician who would determine the course of treatment on the basis of that data.

Because of the nature of the guarantee of trustworthiness, several limitations upon this hearsay exception logically developed. Although information about the cause or source of the condition that would influence the course of treatment came under the qualifying guarantee of trustworthiness, other statements as to causation that simply fixed fault or identified the culprit would not come within the logic of the guarantee. Even those jurisdictions that placed the evidentiary imprimatur on statements as to causation in this first category would not receive statements as to causation in this latter category:

"However, when statements as to causation enter the realm of fixing fault it is unlikely that the patient or the physician regarded them as related to diagnosis or treatment. In such cases, the statements lack any assurance of reliability and would properly be excluded. 'Thus a patient's statement that he was struck by an automobile would qualify, but not his statement that the car was driven through a red light.' Some courts may nevertheless still adhere to a position requiring the exclusion of any statements related to cause." (Footnotes omitted).

*McCormick, supra,* at 840. *Washington B. & A. Elec. Ry. v. Faulkner,* 137 Md. 451, 459, 112 A. 820, 823 (1921); *Hazlitt v. Dewlow,* 171 Md. 398, 402, 189 A. 213–214 (1937).

Maryland has long recognized this exception for Statements Made to a Treating Physician, applying it broadly not only to statements of existing pain or feeling but to past symptoms and medical history as well. "We have applied in this State the universally recognized principle that an attending physician may testify as to the medical history related to him by his patient, and may also state his conclusions reached on the strength of that history." *Candella v. Subsequent Injury Fund,* 277 Md. 120, 123, 353 A.2d 263 (1976). *Adams v. Benson,* 208 Md. 261, 266–267, 117 A.2d 881 (1955); *Yellow Cab Co. v. Henderson,* 183 Md. 546, 552–553, 39 A.2d 546 (1944); *Riddle v. Dickens,* 241 Md. 579, 581, 217 A.2d 304 (1966).

Which of the three categories the out-of-court statements fall into is immaterial as long as they are covered by the qualifying guarantee of trustworthiness: "It may be seen that, when attended by a physician for the purpose of treatment, there is a strong inducement for the patient to speak truly of his pains and sufferings." *Parker v. State,* 189 Md. 244, 249, 55 A.2d 784 (1947). Because of the requirement that this guarantee be present, Maryland exempted from the evidentiary imprimatur statements made to a non-treating physician, such as an expert witness preparing testimony for trial. *Parker v. State, supra,* excluded statements made to a non-treating physician because in that case "defendant was not seeking treatment and cure." 189 Md. at 249, 55 A.2d 784. The heart of the exception, in Maryland and elsewhere, is "the underlying rationale . . . that the patient's statements to his doctor are apt to be sincere when made with an awareness that the quality and success of the treatment may largely depend on the accuracy of the information provided the physician." *Candella v. Subsequent Injury Fund, supra,* 277 Md. at 124, 353 A.2d 263. Maryland has scrupulously refrained from extending the exception to instances where "the trustworthiness which characterizes the declaration is no longer assured." *Id.*

As Judge Wilner pointed out for this Court in *Waltermeyer v. State,* 60 Md.App. 69, 480 A.2d 831 (1984), Maryland, for 30 years following *Parker v. State, supra,* recognized the distinction between "treating" and "examining" physicians with respect to statements made to them by "patients." In *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977), however, Maryland eliminated the distinction in one regard but let it remain in another. It is now the case that a treating physician and an examining physician alike may render in court expert opinions based upon medical histories given to them by patients. In the case of the examining physician, the out-of-court statements made to the physician are not admissible as substantive evidence. They may be inquired into in the probing of the reasons for

the expert opinion, but the jury will be instructed to receive them for that limited purpose only and not as substantive evidence. In the case of statements made to a treating physician, on the other hand, they serve not only as a legitimate predicate for the physician's expert opinion but may also be received, through the medium of the testifying physician, as substantive evidence under this recognized exception to the Hearsay Rule.

The out-of-court assertion, "Daddy did this," failed to qualify under this exception to the Hearsay Rule for several reasons.

1. *The Survival Instinct of the Patient–Declarant:*

■ In terms of the reason for the exception, the subjective purpose of the declarant is vitally important. As was pointed out in *United States v. Iron Shell,* 633 F.2d 77, 84 (8th Cir.1980), "The declarant's motive in making the statement must be consistent with the purpose of promoting treatment." *United States v. Renville,* 779 F.2d 430, 436 (8th Cir.1985), explained the necessity for the subjective purpose, "First, it is assumed that a patient has a strong motive to speak truthfully and accurately because the treatment or diagnosis will depend in part upon the information conveyed." The two-year-old declarant in this case lacked the motive or purpose which is the heart of the trustworthiness guarantee. When asked about the two-year-old's understanding of the purpose of the questioning, Dr. Pullman responded, "I don't know what her understanding of the situation was." The critical colloquy in this regard was as follows:

"Q.: I believe you indicated that she did not understand why you were asking these questions, is that correct?

A: I don't believe that a two-year-old is capable of understanding a concept like why somebody is asking questions."

The doctrinal predicate—the underlying reassurance of trustworthiness—upon which this entire exception to the Hearsay Rule rests was, therefore, entirely lacking in this case. The two-year-old declarant did not understand the nature or purpose of her interview with Dr. Pullman. She was not mature enough to appreciate the critical cause-and-effect connections between accurate information, correct medical diagnosis, and efficacious medical treatment. She was not advanced enough to possess the concerned physical self-interest which is at the very core of this particular evidentiary theory.

Recognizing this unbridgeable gap in the orthodox syllogism, the State attempts to change horses in mid-stream. Literally, it changes theories of trustworthiness in mid-argument. It posits that a two-year-old declarant is too immature to be manipulative with facts; too young to fabricate; therefore, reliable. That may well be true (it may not). It is also quite beside the point. To shift the theory of declarant-reliability, the central rationale for each hearsay exception, is to shift completely out of the Statement of Bodily Condition to Treating Physician exception. It would require moving into a framework of analysis for some other hearsay exception: 1) an exception now in existence, 2) an exception yet to be invented, or 3) an exception that will never find acceptance. In any event, we would have to start all over again, after first identifying the hearsay exception to be analyzed and then setting forth the pertinent qualifying criteria for that exception.

Indeed, the rationale for trustworthiness argued by the State—an infantile naivete—actually contradicts the trustworthiness rationale on which the Treating Physician exception exclusively depends. The latter requires a certain level of conscious sophistication on the part of the declarant—a purposeful motivation to describe accurately arising out of concerned self-interest. That purposeful motivation did not exist here. Without it, the necessary predicate for this particular hearsay exception cannot exist.

## 2. The "Tender Years" Exception:

█ The State's argument resonates with the language and with the notions of what is coming to be called the "Tender Years" exception. It is an exception that has never found acceptance within the Common Law of Evidence. It may, of course, be accepted at some future time. That, however, would be quintessentially a legislative determination.

The special social problem of child abuse—sexual and otherwise—has generated a great deal of legislative response. *See* Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations*, 98 Harv.L.Rev. 806 (1985); Comment, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 Col.L.Rev. 1745 (1983); Bulkley, *Evidentiary and Procedural Trends in State Legislation and Other Emerging Legal Issues in Child Sexual Abuse Cases*, 89 Dick.L.Rev. 645 (1985). One of these responses has been the statutory creation of a Hearsay Rule exception for out-of-court assertions by children (generally under 10 years of age) who have been victims of sexual abuse. Whereas only two states (Kansas and Washington) had such statutory hearsay exceptions in 1982, eighteen states had such statutes by 1985.[12] According to *The Daily Record* of December 30, 1987, reporting the pre-filing of a bill in the Maryland

---

12. Alaska: Alaska Stat. § 12.40.110 (1985); Arizona: Ariz.Rev.Stat. Ann. § 13-1416 (1985); Arkansas: Ark.R.Evid. 803(25)(A); Colorado: Colo.Rev.Stat. § 18-3-411(3) (1984); Florida: Act of May 31, 1985, ch. 85-53, § 90.803(23), Fla. Laws 140, 141-42; Illinois: Ill. 83rd Gen.Assem.P.A. 83-1067 § 115-10; Ill.Ann.Stat. ch. 37, § 704-6(4)(c) (Smith-Hurd 1985); Indiana: Ind.Code § 35-37-4-6 (1985); Iowa: Iowa Code Ann. § 232.96(6) (1985) (juvenile court only); Kansas: Kan.Stat. Ann. § 60-460(dd) (1983); Minnesota: Minn.Stat. § 595.02(3) (1985); Missouri: H.R. 366, § 491.075, 83rd Gen. Assembly, 1st Sess., 1985 Mo.Legis.Service 20, 60; Nevada: Nev.Rev.Stat. ch. 48 (1985) (cases only); Rhode Island: R.I.Gen.Laws § 14-1-69 (1985) (custody or parental termination cases only); South Dakota: S.D. Codified Laws Ann. § 19-16-38 (1985); Texas: Tex.Crim.Proc.Code Ann. § 38.072 (Vernon 1985); Tex.Fam.Code Ann. § 54.03 (Vernon 1985); Utah: Utah Code Ann. § 77-35-15.5 (1985); Vermont: Vt.R.Evid. 807(a); Washington: Wash.Rev.Code § 9A.44.120 (1985).

General Assembly to pass a similar statute, 27 states now have such statutes. Pre-filed Senate Bill # 24 will place just such a proposal before the 1988 session of the General Assembly.[13] The bill would permit, with certain qualifications, out-of-court assertions by child abuse victims under 12 years of age made to anyone—parents, police officers, teachers, etc. Treating physicians would enjoy no special status as hearsay auditors under the proposed exception. Even where the new "tender years" exception is created by statute, however, it is clear that the new exception has no remote connection with the Statement of Bodily Condition to a Treating Physician exception. It is a distinct exception with a distinct rationale of its own.

For present purposes, what is implicit in the proposal to create such a statutory exception to the Hearsay Rule is that such an exception does not already exist. Yet another indication that a "tender years" exception does not presently exist is the fact that a similar bill to create just such an exception was introduced in the 1987 Session of the General Assembly and failed of passage. Senate Bill 253 passed the Maryland Senate by a vote of 42–5 but was rejected by the House Judiciary Committee by a vote of 13–9. The Legislature had before it the very rationale the State is urging upon us and refused to adopt it.

Notwithstanding the strong need for such evidence in child abuse cases, the "tender years" exception has several inherent problems. The first hurdle to be overcome is that of demonstrating the truth of the alleged psychological phenomenon that a declarant of tender years is more likely than a more mature declarant to make truthful assertions.

---

**13.** Maryland has already responded to another of the difficulties facing child-abuse victims. Chapters 495 and 499, Acts of 1985, enacted what is now codified as Md.Cts. & Jud.Proc. Code Ann. § 9–102 (1984 Repl.Vol., 1987 Supp.), providing for closed circuit testimony by the child under certain conditions. Recognizing the delicate balancing of competing interests that must be made in those cases, the Court of Appeals upheld the constitutionality of the legislative response in *Wildermuth v. State,* 310 Md. 496, 530 A.2d 275 (1987).

Accepting, *arguendo,* that that psychological truth has been demonstrated, there is then no rational basis for limiting the exception to child abuse cases. If an assertion by a declarant of tender years is deemed reliable, why shouldn't it be received to describe a homicidal episode, to identify a burglar, or even to tell us about an automobile collision? If, on the other hand, it is not reliable, no necessity in the world can justify its admission. If the theory is that we should tolerate lesser reliability in cases of greater necessity, that might explain the application of the exception to child abuse cases as a class. It would not explain, however, the automatic application of the exception to a particular child abuse case where there is an *ad hoc* determination that the hearsay is not indispensable; nor would it explain the refusal to apply the exception to a particular burglary case where there is an *ad hoc* determination that the hearsay is indispensable. Involved here is the age-old conflict between result orientation and neutral principles. If we substitute fiat for general principle, we lose the ability to reason by analogy, which is the lifeblood of our legal system. For immediate purposes, however, the State does not have the benefit of either a fiat or a general principle.

3. *Medical Treatment Is Not Social Disposition:*

 Even if the declarant in this case had been old enough to understand the nature and purpose of the interview with Dr. Pullman, however, the assertion, "Daddy did this," would still not qualify under this particular exception because it was not related to medical treatment. The bruises were at least three days old. No treatment of physical symptoms was involved. The reliable assertions contemplated by this exception are aimed at determining the need for such physical measures as antiseptics, stitches, antibiotics, painkillers, X-rays, surgery, etc. The identity of the person who inflicted the bruises, albeit perhaps of transcendent social importance, is not ordinarily of strictly

medical importance.[14] Once the perceived end purpose of the examination moves beyond the medical treatment of a physical ailment, the reason for this particular exception ceases to exist—the fear that a doctor will do a wrong and harmful thing to the declarant's body. The strong motivation to describe present and past symptoms accurately is to avoid having the doctor take out an appendix when he ought to be treating an ulcer. When we move from the realm of physical treatment to the quite different realms of social disposition or even psychiatric counselling, we are involved in very different states of mind on the part of the declarant.

One of the dialectic techniques employed by those who would use the Statement to Treating Physician exception as a vehicle for expanding hearsay admissibility, particularly for child-abuse victims, is to slide by way of easy and insidious gloss from "physical trauma and treatment" to "emotional trauma and diagnosis." The clever use of an expanding definition of "medical condition" creates a domino effect. As long as the focus is confined to one small step at a time, the distance from the last decade's expansion to the next decade's new expansion is imperceptible. Once an expansion finds acceptance for a period of years, it becomes easy to forget that we are already at the outer limits of the original logic. Having forgotten that, it then becomes easy to take that earlier expansion of the principle as a new base camp for yet further expansion. Only by reference back to the origin of the exception, can we appreciate how far the expansionists have come from the original spontaneity of a statement of then-existing physical condition, from the reassuringly spontaneous complaint as to immediate pain and suffering. The danger of stretching a principle beyond its breaking point was recognized by *McCormick, supra,* at 840 n. 8:

---

**14.** When there is a danger that an assault victim may have contracted a communicable disease, of course, the identity of the assailant may take on significant medical pertinence.

"With regard to statements to psychiatrists, the reasoning that supports the hearsay exception for statements to physicians generally may be questioned, since the credibility of the statement may be skewed by the very condition under inquiry, as well as by the breadth of the psychiatric interview. The practice of admitting psychiatric interviews with instructions limiting their use to showing the basis of the psychiatrist's opinion has greater validity than similar limitation upon medical history generally. See *State v. Griffin*, 99 Ariz. 43, 406 P.2d 397 (1965); *State v. Wade*, 296 N.C. 454, 251 S.E.2d 407 (1979); *State v. Myers*, 222 S.E.2d 300 (W.Va.1976). The wide variation of possible situations suggests resort to the judge's discretion to exclude under Federal Rule 403 if appropriate."

Federal Rule 803(4) dramatically liberalized admissibility by eliminating the requirement that the statement be with respect to the declarant's *bodily* condition. In view of the open-ended relevancy of such inquiries, J. Weinstein & M. Berger, *Evidence* ¶ 803(4)[01], at 803–150 and 803–151 (1984), points out the caution that should be employed:

"Statements made pertaining to mental health are not expressly treated. Unlike Uniform Rule 63(12)(c), there is no requirement that the statement be 'relevant to an issue of declarant's bodily condition.' Statements made to a psychiatrist or to someone like a psychologist, who would relay them to a medical doctor, fall within Rule 803(4)'s category of 'statements made for purposes of medical diagnosis or treatment.' As a general rule all statements made in this context, regardless of their content, are relevant to diagnosis or treatment since experts in the field view everything relating to the patient as relevant to his personality. Nevertheless, the statements may be extremely unreliable as evidence of the facts related, since the condition for which the patient is consulting the psychiatrist may have impaired his perception, memory or veracity." (Footnotes omitted).

In the effort to map the reasonable limits of such notions as "medical treatment" and "bodily condition," there is a helpful analogy between this exception and the distinct but closely related hearsay exception—the medical records subdivision of the Business Records exception. Assuming all other requirements to show a record kept in the ordinary course of business have been satisfied, the substance of a hospital record that may be admitted as an exception to the Hearsay Rule is limited to that data which is "medically or pathologically germane." In *Marlow v. Cerino*, 19 Md.App. 619, 635, 313 A.2d 505, 514 (1974), Chief Judge Gilbert dealt with the term "pathologically germane": "As we construe the term it means having significant bearing upon and relation to the *disease or injury* from which one suffers." (Emphasis supplied). In *Yellow Cab Co. v. Hicks*, 224 Md. 563, 570, 168 A.2d 501, 504 (1961), the Court of Appeals stated that "statements in a hospital record must be 'pathologically germane' to the *physical condition* which caused the patient to go to the hospital in the first place." (Emphasis supplied). *Lee v. Housing Auth.*, 203 Md. 453, 458–461, 101 A.2d 832, 833–835 (1954) ("The entries do not undertake to establish the cause of the explosion . . ."); *Old v. Cooney Detective Agency*, 215 Md. 517, 138 A.2d 889 (1958); *Bethlehem Sparrows Point Shipyard v. Scherpenisse*, 187 Md. 375, 50 A.2d 256 (1946); *Scott v. James Gibbons Co.*, 192 Md. 319, 330, 64 A.2d 117, 122 (1949); *Sarrio v. Reliable Contracting Co.*, 14 Md.App. 99, 101–102, 286 A.2d 183 (1972).

When the purpose of the physician's examination moves yet farther afield, from predictions of the emotional and mental impact of the abuse upon the child to a recommendation as to the social disposition of the child, the original logic for the exception has been not only stretched but snapped. The State, with some supporting case law,[15] ar-

---

**15.** *United States v. Renville*, 779 F.2d 430 (8th Cir.1985). A discussion of *Renville* and a listing of cases that follow its line of reasoning will appear in the next subsection of this opinion.

gues that a physician such as Dr. Pullman is charged with making a recommendation as to the social disposition of the child. If a child is being abused by a relative, it may be imperative to remove the child from that environment. True as that may be, it is a consideration beyond the logic of this particular hearsay exception. That Dr. Pullman had as strong a social obligation as she had a medical obligation toward this two-year-old patient does not, *ipso facto,* transmute the social concern into a medical one. It is rather the case that in the context of child abuse, the physician wears two hats. Only one of those hats, however, relates to this particular hearsay exception.

There is a demonstrable flaw in the State's logic. The State's major premise is that every assertion on which Dr. Pullman legitimately relied for her purposes is an assertion on which the jury may thereby rely for its purposes. The minor premise is that Dr. Pullman, in order to recommend a proper disposition of the child, needed to know the identity of the abuser. The conclusion is that the jury is thereby entitled to hear the same assertion that Dr. Pullman heard, identifying the abuser.

The flaw is that the major premise is not true. Federal Rule 803(4), on which this strain of reasoning depends, does, to be sure, provide that any information utilizable by a treating *or* examining physician to form an expert opinion thereby qualifies as substantive evidence under this hearsay exception. The common law of evidence generally and Maryland law specifically, on the other hand, are quite to the contrary. They allow a great deal of data, such as the recitation of the medical history or the identification of the source of the trauma, to serve as the basis for an expert opinion. The expert opinion itself is admissible in evidence. The expert witness, moreover, may refer to out-of-court data when being examined as to the basis of the expert opinion. In the case of the examining physician, however, the out-of-court information that goes into the formation of the expert opinion is not itself receivable as substantive evidence and the jury is so instructed. *Beahm v. Shortall,*

38

279 Md. 321, 327, 368 A.2d 1005 (1977); *Waltermeyer v. State*, 60 Md.App. 69, 77–78, 480 A.2d 831 (1984). The need to know on the part of the expert does not *ipso facto* guarantee the reception in evidence of the thing needed to be known.

In stretching outward their list of a physician's responsibilities and in pushing forward with their definition of "medical treatment and diagnosis," the expansionists have left behind, abandoned and forgotten, the state of mind of the declarant. That state of mind, however, is and always has been the *sine qua non* for every hearsay exception. The state of mind of a declarant *vis-à-vis* anticipated physical treatment is quite different from the state of mind of a declarant *vis-à-vis* anticipated social disposition. The situations may be the same to the doctor; they are not the same to the patient. Physical self-survival dictates revealing even embarrassing truth to avoid the risk of the wrong medicine or the needless operation. Presupposing a declarant conscious of the probable consequences of his assertions, the imperative to speak truthfully is not nearly so strong when the anticipated result is a social disposition. The temptation to influence the result may, indeed, run in quite the opposite direction. Truthful answers as to the identity of its abuser may well wrench a child from the reassuring presence of its mother or father or both. It is highly unlikely that there operates in an infant declarant a compelling desire to bring about such a result.

There may be in the infant's declaration other indicia of reliability, but not those indicia classically and logically associated with the Statement as to Bodily Condition to a Treating Physician exception. Obtaining proper medical treatment is generally perceived by the declarant as being in the declarant's interest; a terrifying, even if necessary, social uprooting will probably be perceived by an infant declarant as not being in the infant declarant's interest. When opposite rationales are glibly interchanged, we have lapsed into Orwellian Doublespeak.

### 4. *The False Light of Federal Rule 803(4) and Some of Its Interpretative Case Law:*

 One final problem remains to be considered. There is a not insubstantial strain of case law, relied on heavily by the State here, that would admit into evidence a child abuse victim's identification of its abuser made to a treating or examining physician. The flagship case is the 1985 decision of the 8th Circuit in *United States v. Renville*, 779 F.2d 430. At least four states have relied on *Renville* to reach similar results. *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801 (1987); *Stallnacker v. State*, 19 Ark.App. 9, 715 S.W.2d 883 (1986); *People v. Galloway*, 726 P.2d 249 (Colo.App. 1986); *State v. Aguallo*, 318 N.C. 590, 350 S.E.2d 76 (1986). Two other states, although not developing the rationale as fully, actually anticipated *Renville* as to the admissibility of out-of-court assertions by child abuse victims identifying the abuser. *People v. Wilkins*, 134 Mich.App. 39, 349 N.W.2d 815 (1984); *Goldade v. State*, 674 P.2d 721 (Wyo. 1983).

We, however, find that entire line of cases totally unpersuasive. In the first place, the opinions are, in our judgment, poorly reasoned. Because of the strong desire for getting a child's identification of its abuser into evidence, the opinions strain for their results. While sympathizing with the motive behind the decisions, we reject, as an appellate modality, result-orientation and the bad law it frequently generates.[16] In the second place, all of the cases

---

**16.** The endorsement of result-orientation over process-orientation could not have been more blatant than it was in *Goldade v. State*, 674 P.2d 721, 725 (Wyo.1983):

"If the goal of our court were simply to pursue the common-law tradition of *stare decisis*, then the cited authorities must be recognized as supporting the position of the appellant. In this instance, however, the function of the court must be to pursue the transcendent goal of addressing the most pernicious social ailment which afflicts our society, family abuse, and more specifically, child abuse."

rest on a doctrinal predicate which has been rejected by common law evidence generally and Maryland specifically.

Both problem areas trace back to Federal Rule 803(4). The 8th Circuit, as a matter of course, relied upon the then new Federal Rules of Evidence. Each of the state decisions relied upon a close or identical counterpart to Rule 803(4).

The flawed reasoning, while not actually dictated by Rule 803(4), found its source there. The *Renville* analysis relied upon language from the earlier 8th Circuit decision of *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980). *Iron Shell* deemed an out-of-court assertion by a nine-year-old attempted rape victim made to a physician to be admissible.[17] The state of mind of the declarant posed no credibility problem. The *Iron Shell* opinion initially and properly focused upon that state of mind:

"The rationale behind the rule has often been stated. It focuses upon the patient and relies upon the patient's strong motive to tell the truth because diagnosis or treatment will depend in part upon what the patient says. It is thought that the declarant's motive guarantees trust-

---

Lest there remained any doubt that it was tailoring its law of evidence to the curing of one of Society's ills, the Wyoming Supreme Court went on:

"This court has pursued a policy in child homicide cases of developing rules which ultimately will assist in protecting the innocent victims of child abuse.... While this standard of proof well may be a minimal one, no apology is necessary for this policy. Because of the manifest need to protect the most helpless members of our society from violence on the part of others, the policy is both necessary and proper."

*Id.* at 727. One is left to wonder if there is no legislature in Wyoming.

17. A second assertion by the nine-year-old assault victim, naming her assailant, was held admissible as an Excited Utterance. It was made to a policewoman between 45 minutes and an hour and 15 minutes after the assault. Although troubled by the time lapse, the 8th Circuit was persuaded by the violence of the assault, the struggle between the assailant and the victim, the fact that "he had threatened her with serious harm," the "stress and fear that such an occurrence would impose," the description of the declarant as "nervous and scared," and the fact that she "spoke in short bursts about the incident" to defer to the trial judge as not having abused his discretion. 633 F.2d at 85–86.

worthiness sufficiently to allow an exception to the hearsay rule."

*Id.* at 83–84. The opinion did not need to rely on Rule 803(4)'s abolition of "the distinction between the doctor who is consulted for the purpose of treatment and an examination for the purpose of diagnosis only." *Id.* at 83. Within two hours of a violent attack, the physician was the first medical professional to attend the victim. Her description of the attack assisted "his examination by pinpointing areas of the body to be examined more closely and by narrowing his examination by eliminating other areas." *Id.* at 84. The classic indicia of reliability were all present:

> "We find no facts in the record to indicate that Lucy's motive in making these statements was other than as a patient seeking treatment. Dr. Hopkins testified that the purpose of his examination was two-fold. He was to treat Lucy and to preserve any evidence that was available. There is nothing in the content of the statements to suggest that Lucy was responding to the doctor's questions for any reason other than promoting treatment. It is important to note that the statements concern what happened rather than who assaulted her. The former in most cases is pertinent to diagnosis and treatment while the latter would seldom, if ever, be sufficiently related.... All of Lucy's statements were within the scope of the rule because they were related to her physical condition and were consistent with a motive to promote treatment." (Citation omitted) (Footnote omitted).

*Id.*

The defendant's challenge was far more narrow. He focused upon the words with which Rule 803(4) qualifies "Statements made for purposes of medical diagnosis or treatment":

> "... insofar as reasonably pertinent to diagnosis or treatment."

Granting the credibility of the declarant, the analysis that followed dealt exclusively with the medical pertinence of the subject matter of the assertion.

The reason why the doctor asks a question is self-evidently relevant to the issue of medical pertinence. Pertinence, within the contemplation of Rule 803(4), is an objective consideration beyond the declarant's subjective state of mind. In discussing the obvious connection between medical inquisitiveness and medical pertinence, *Iron Shell* looked to a statement, encompassing this issue within a potentially broader compass, in J. Weinstein & M. Berger, *Evidence* ¶ 803(4)[01], at 803–146 (1984):

> "Moreover, as a matter of policy, a fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription. The test for statements made for purposes of medical diagnosis under Rule 803(4) is the same as that in Rule 703—is this particular fact one that an expert in this particular field would be justified in relying upon in rendering his opinion?"

Building upon the comment by Judge Weinstein, *Iron Shell* proceeded to construct a "two-part test" for admissibility. In context, the first part dealt with the spontaneity of the declarant and the second part dealt with the medical pertinence of the declaration. The phraseology, however, was ambiguous enough to cause potential trouble if ever read out of context:

> "Judge Weinstein, in his treatise, suggests another policy ground. He writes that 'a fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription.' Weinstein & Berger, *supra*, at 803–129. This principle recognizes that life and death decisions are made by physicians in reliance on such facts and as such should have sufficient trustworthiness to be admissible in a court of law. This rationale closely parallels that underlying rule 703 and suggests a similar test should apply, namely—is this fact of a type reasonably relied upon by experts in a particular field in forming opinions. *See* Fed.R.Evid. 703 (Basis of Opinion Testimony by Experts). Thus, two independent rationales support the rule and are helpful in its application. A two-part test flows naturally from this dual rationale:

first, is the declarant's motive consistent with the purpose of the rule; and second, is it reasonable for the physician to rely on the information in diagnosis or treatment." 633 F.2d at 84. In the context of *Iron Shell*, the two parts of the test were clearly in the conjunctive. The first part of the test, dealing with the declarant's motivation, was held to be clearly satisfied before the court moved on, of necessity on the slightly different sub-issue of medical pertinence, to its pioneering articulation of the second part of the test. There is no rational criticism of anything said (or, at least, of anything held) by *Iron Shell.*

In the movement from *Iron Shell* to *Renville,* a subtle semantic elision took place. Out of context, *Iron Shell* 's conjunctive two-part test became, in effect, a disjunctive or alternative test. Instead of a sub-issue, medical pertinence became the pivotal criterion. In the process, primary attention shifted away from the hearsay declarant and onto the physician.

Whereas in *Iron Shell* the investigation was in the hands of the authorities within an hour after the assailant had been beaten off, in *Renville* the non-violent sexual abuse of an eleven-year-old stepdaughter only surfaced coincidentally when the victim's brother revealed it in the course of an unrelated detention hearing. Unlike the *Iron Shell* situation, the physician in *Renville* rendered no treatment for physical trauma. The physician in *Renville* was a specialist in "family practice medicine." Whereas the assertion in *Iron Shell* described the attack, the assertion in *Renville* identified the abuser. The attack in *Iron Shell* preceded the doctor's interview by less than two hours; all we know about the abuse in *Renville* was that it had occurred sometime within the preceding year. Although later weakly equivocating on the subject, the initial *Renville* analysis frankly recognized the futility of looking too closely at the state of mind of the eleven-year-old hearsay declarant:

"The court in *Iron Shell* recognized, however, that a declarant's statements relating the identity of the individual allegedly responsible for his injuries or condition

'would seldom, if ever,' be reasonably pertinent to treatment or diagnosis.... Statements of identity seldom are made to promote effective treatment; the patient has no sincere desire to frankly account for fault because it is generally irrelevant to an anticipated course of treatment."

779 F.2d at 436. The *Renville* analysis turned almost embarrassingly away from the state of mind of the declarant to focus almost exclusively on the state of mind of the questioning physician.[18] *Renville* first adopted *Iron Shell*'s two-part test:

"In *United States v. Iron Shell,* ... this court set forth a two-part test for the admissibility of hearsay statements under rule 803(4): first, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." (Citation omitted).

*Id.* The second part of that two-part test—the assessment of medical pertinence—then became, in effect, a sufficient criterion for determining ultimate admissibility:

"We therefore believe that statements of identity to a physician by a child sexually abused by a family member are of a type physicians reasonably rely on in composing a diagnosis and course of treatment. Admission of these statements, therefore, is fully consistent with the rationale underlying the second component of the *Iron Shell* test."

*Id.* at 438. The subject matter of the declaration had effectively displaced the motive behind the declaration.

---

**18.** In a superficial gloss, *Renville* paid technical lip-service in a passing consideration to the youthful declarant's state of mind but did so in a way that effectively downgraded its significance. Some of the *Renville* progeny do not even go through the superficial exercise as they turn exclusive attention on the issue of medical pertinence.

The bizarre consequence of resting ultimate admissibility on this second criterion—one aimed only at the objective issue of medical pertinence—is that for the first time in the history of hearsay law, the state of mind of the hearsay declarant is effectively ignored. Every classical definition of hearsay relentlessly points out that the out-of-court assertion offered in court for the truth of the thing asserted is an assertion *"thereby depending for its value upon the credibility of the out-of-court asserter."* The mind of the declarant had been the "ever-fixed mark" from which our gaze never wandered. In *Renville,* we are suddenly and unbelievably reckoning the value of the hearsay not upon the state of mind of the hearsay declarant, but upon the state of mind of the hearsay auditor. Three hundred years of hearsay theory had been dropped overboard—possibly inadvertently. Dean Wigmore must be spinning in his grave.

It is a classic illustration of the domino theory run rampant. The Spontaneous Statement of Then–Existing Pain and Suffering was pushed to its arguable limits as it gave birth to the Statement of Bodily Condition to a Treating Physician. Rule 803(4) then took the affiliate as a new beginning and focused more upon the mission of the physician than upon the motive of the declarant as it equated statements to an attending physician for purposes of treatment with statements to an examining physician for purposes of trial testimony. Judge Weinstein then proffered an academic explanation for the new departure made by Rule 803(4). *Iron Shell,* in turn, took the Weinstein discussion as its new beginning in promulgating a test for "reasonable medical pertinence." *Renville* looked back only as far as *Iron Shell* as it subtly transformed a two-part test for pertinence into an alternate test for ultimate admissibility. By the fifth generation, *Renville* had lost all contact with the foundation of spontaneity upon which the entire edifice had been erected. There is a breaking point beyond which the energizing principle cannot be stretched.

The *Renville* analysis is flawed in yet another respect. It forgot the fact that the exception is rooted in the practice of

medicine. The first step was from physical injury to emotional injury:

"First, child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime." (Footnote omitted).

*Id.* at 437. Would the category now embrace statements to a religious counselor? The next step moved beyond psychological evaluation into the field of recommending social disposition:

"Second, physicians have an obligation, imposed by state law, to prevent an abused child from being returned to an environment in which he or she cannot be adequately protected from recurrent abuse. This obligation is most immediate where the abuser is a member of the victim's household, as in the present case. Information that the abuser is a member of the household is therefore 'reasonably pertinent' to a course of treatment which includes removing the child from the home." (Footnote omitted).

*Id.* at 438. At that point, there is no longer anything special about the unique role of a medical doctor. Specialists from many disciplines, all highly trained professionals, may have an equal "obligation, imposed by state law, to prevent an abused child from being returned" to the abusive environment. Will the professional obligation to make an informed recommendation as to social disposition cause the Statement to a Treating Physician exception to embrace statements to a social worker, a non-medical psychologist, a teacher, a probation officer, a non-abusive parent or relative, a police officer, the state's attorney whose decision to prosecute may be influenced by the best interest of the child, the judge who spoke privately with the child in a collateral custody dispute? Their roles and responsibilities are no different, in this regard, from those of the doctor. The last domino has fallen far from the energizing push.

This line of case law also betrays a deference to the medical profession that borders on an unconstitutional del-

egation of judicial decision-making to the doctor. Judge Weinstein's analysis reflects this line of thinking:

"Since doctors may be assumed not to want to waste their time with unnecessary history, the fact that a doctor took the information is *prima facie* evidence that it was pertinent."

*Weinstein's Evidence, supra,* ¶ 803(4)[01], at 803–148. Quite aside from the delegation question, there is no principled basis for confining the rationale to the medical community. The rationale, emanating from both the Commentary on Rule 803(4) and *Weinstein's Evidence,* was boldly stated in *People v. Wilkins,* 134 Mich.App. 39, 349 N.W.2d 815, 817 (1984):

"[F]acts reliable enough to serve as a basis for medical diagnosis are also reliable enough to escape the hearsay proscription. Since life and death decisions are made by physicians in reliance on the facts related by the patient, they should have sufficient trustworthiness to be admissible in a court of law."

Are "facts reliable enough to serve as a basis for" the constitutionally elected State's Attorney's decision to prosecute "also reliable enough to escape the hearsay proscription"? When the commander's "life and death decision" to endanger the rear-guard, the policeman's "life and death decision" to shoot at a fleeing felon, or the battalion chief's "life and death decision" to dynamite a fire lane are made "in reliance on facts related by" others, should those facts also "have sufficient trustworthiness to be admissible in a court of law"? Deference or non-deference by the law of evidence to the decision-making techniques of other disciplines is a general phenomenon and not one that permits of unique deference to the medical profession.

It follows from the above that we do not find *Renville* persuasive. Even if its logic and that of its progeny were impeccable, however, they still rest on a doctrinal predicate which Maryland has rejected.

Common law evidence generally, and Maryland specifically, have avoided the problem of equating a court's reception of evidence with an expert's reception of evidence. They recognize that not only physicians but a wide variety of experts in various fields of expertise are called upon to make informed judgments, sometimes resulting in expert opinions in court, on the basis of all kinds of data. They have felt no necessity to equate the expert's consideration of second-hand information with the court's consideration of second-hand information. Certain second-hand information is considered competent grist for the expert's mill. An expert opinion formed upon the basis of such information is admissible in court. The expert, moreover, may be examined as to the basis of the expert opinion and, in the course of that examination, he may detail the information. The information itself, however, is not received by the fact-finding jury or fact-finding judge as substantive evidence but only as serving for the basis of the expert's opinion. *Weinstein's Evidence, supra,* ¶ 803(4)[01] articulately describes this process, at 803–146:

> "Many jurisdictions, however, permit a non-treating physician to recite the patient's statements, not as proof of the facts stated, but to show the basis of the physician's diagnosis or opinion. They recognize that a physician frequently makes decisions even of life and death, taking, what is technically, hearsay into consideration. If court and jury are to profit from the witness' expertise, he must be allowed to exercise it in a way compatible with his professional judgment. Rule 703 acknowledges this by providing that the facts on which expert testimony is based need not be admissible if of a kind ordinarily relied upon by experts in the particular field. See ¶ 703[01], *supra.*" (Footnote omitted).

Federal Rule 803(4) eliminated the preexisting distinction between what the medical expert may consider and what the jury may consider. By abolishing any distinction between the case of the treating physician and the case of the examining physician, Rule 803(4) and the states that

adopted it are exposed on the slippery slope of 1) losing sight of the critically significant state of mind of the declarant, 2) sliding almost imperceptibly from cases of physical trauma to cases of emotional distress to cases calling for a recommendation as to social disposition, and 3) making nonsensical distinctions between the doctor's recommendation as to social disposition and the social worker's recommendation as to the same thing on the same facts. Nonetheless, the logical distinction was eliminated. Again, *Weinstein's Evidence, supra,* ¶ 803(4)[01], at 803–146, describes the change:

"Rule 803(4) rejects the distinction between treating and nontreating physicians because, as a practical matter, the advisory committee found that jurors do not distinguish between facts admitted for their truth and facts revealed as the basis for the expert's opinion." (Footnote omitted).

The cracks and flaws we discern in *Renville* and its progeny are directly attributable to Rule 803(4)'s removal of that undergirding distinction. Maryland, by contrast, has deliberately refrained from undercutting the basic logic and theory of the hearsay exceptions. Indeed, prior to 1977, Maryland would not even receive in evidence an expert opinion from an examining physician based on out-of-court assertions. *Candella v. Subsequent Injury Fund,* 277 Md. 120, 123–124, 353 A.2d 263 (1976). In *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977), however, we lowered the bar slightly so as to receive the expert opinion as such. In terms of out-of-court assertions qualifying as substantive evidence, we rigorously maintained the distinction between statements made to a treating physician and statements made to an examining physician:

"We hold that a physician, who examines a patient, not for the purpose of treatment, but in order to qualify as an expert witness, may present his medical conclusions and the information, including the history and subjective symptoms, received from the patient which provide the

basis for the conclusions. The conclusions are admissible as substantive evidence. The statements made by the patient, as narrated by the physician, are admissible, with a qualifying charge to the jury, only as an explanation of the basis of the physician's conclusions and not as proof of the truth of those statements." (Footnote omitted). 279 Md. at 327, 368 A.2d 1005.

We did not, moreover, act in ignorance of Rule 803(4):

"We are not prepared at this time to go as far as does Rule 803(4) of the Federal Rules of Evidence, 28 U.S.C.A. (1975) which became effective 1 July 1975.... Rule 803(4) rejects the distinction between treating and non-treating physicians as a practical matter and a matter of policy. By the same token, we are not as firmly convinced as the Advisory Committee to the Proposed Federal Rules was in approving Rule 803(4), and as the Congress apparently was in enacting legislation adopting it, ... that the task of considering the patient's declarations only as an explanation of the basis for an opinion and not as proof of the truth of those declarations is beyond the ability and inclination of the jury."

*Id.* at 327–328 n. 5, 368 A.2d 1005.

*Renville* and progeny, therefore, are not only unpersuasive; they are inapposite as well.

### Conclusion

The out-of-court assertion, "Daddy did this," was not an Excited Utterance. Neither was it a Statement of Bodily Condition Made to a Treating Physician. *A priori*, it was not part of some ill-defined thing once called *res gestae*. Its admission into evidence was, therefore, in error. The error, moreover, was not harmless.

JUDGMENTS REVERSED; CASE REMANDED FOR NEW TRIAL; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.