*Troy Wayne Mason v. State of Maryland*, **No. 1198 of the September 2022 Term, Opinion by Moylan, J.**

**HEADNOTE:**

THE MISTRIAL MOTION: A PATCH OF ROUGH WATER OR HITTING AN ICEBERG? – A MOTION FOR A MISTRIAL: WHO MAKES THE CALL? – AN EXASPERATINGLY CONVOLUTED GLITCH – THE ABSENCE OF BAD FAITH – PRECISE PLEADING CALLS FOR MORE THAN UNDIFFERENTIATED ANGST – THE ABSENCE OF SIGNIFICANT PREJUDICE: "CALM SEA AND PROSPEROUS VOYAGE" – THE MISSION OF CAREFUL REDACTION – THE RULE AGAINST HEARSAY – AN EXCITED UTTERANCE – THE PRESENT SENSE IMPRESSION – THE ALLOCATION OF THE BURDEN OF PROOF – THE REDACTION – A PRUDENT SOLUTION: SALVAGE WHAT CAN BE SALVAGED – SELF-DEFENSE: A CONTENTION LEFT IN THE STARTING GATE – A MULTI-FACTORED PARADIGM – SELF-DEFENSE: A CAUSE-AND-EFFECT RELATIONSHIP – TARGET IDENTIFICATION – PINNING DOWN PETER PAN – MEASURING THE SEVERITY OF A MERELY HYPOTHETICAL ASSAULT – JUDGE OESTERREICHER'S RULING – "MUCH ADO ABOUT NOTHING"

Circuit Court for Carroll County
Case No. C-06-CR-21-000610

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1198

September Term, 2022

_____

TROY WAYNE MASON

V.

STATE OF MARYLAND

_____

Leahy,
Beachley,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: July 3, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

The appellant, Troy Mason, was convicted in the Circuit Court for Carroll County by a jury, presided over by Judge Maria Oesterreicher, of a single count of second-degree assault. He was sentenced to ten years of incarceration, with all but seven years suspended. On appeal, the appellant raises the following contentions:

1. **That Judge Oesterreicher erroneously failed to grant a mistrial when it was discovered that the fourth page of a four-page police report was incorrect and had been filed by mistake;**

2. **That the State was erroneously permitted to present hearsay evidence contained in a 911 call;**

3. **That the trial judge erroneously denied the appellant's request for a self-defense instruction; and**

4. **That the court erroneously allowed a police officer to testify to statements made by the complaining witness during the course of the investigation.**

## The Mistrial Motion:
## A Patch Of Rough Water Or Hitting An Iceberg?

We begin with the proposition that <u>there is no such thing as a perfect trial</u>. <u>Every hard-fought and spirited contest inevitably produces a few bumps and bruises</u>. It is the collective wisdom of the American trial process, however, that <u>hard-fought and spirited trials generate their own reward</u> and that <u>the inherent value of the adversarial system accepts the cost of a few bumps and bruises along the way</u>.

<u>Georges v. State</u>, 252 Md. App. 523, 526, 259 A.3d 249 (2021). (Emphasis supplied.)

The unquestioned mistake that occasioned the motion for a mistrial here was unfortunate, but it is difficult to characterize it as anything more grievous than a trial glitch. The ultimate question on this mistrial issue, as on so many mistrial issues, is not one of whether an error occurred. Almost inevitably an error will have occurred or the mistrial issue would never have arisen. The meaningful question is not whether an error occurred.

The meaningful question is that of how to respond to the error. Every trial error is not the occasion for a mistrial. Every mishap is not a calamity. As at the outset of our consideration of this issue, we find prudent guidance in Georges v. State, 252 Md. App. at 528:

> When, therefore, the issue is not so much that of error *vel non* but rather that of the appropriate response to the error, the critical need is for calm perspective. It is not so much a question of "What?" as it is a question of "How much?" As the appellate court assesses the entire trial voyage, of which the brief contretemps in [question] is but a part, was that incident a mere patch of rough water or had the trial at that point truly struck an iceberg? The appellant now insists that in this case the captain had no choice but to order, "Abandon Ship!" The State responds that the captain's sure and steady hand on the tiller properly kept the ship on its intended course. The critical issue, of course, is not the initial bump…but the appropriateness of the ensuing response. Did this trial experience, at worst, a patch of rough water or should the entire trial have been totally aborted? And who, moreover, gets to make that call?

(Emphasis supplied.)

In Molter v. State, 201 Md. App. 155, 178, 28 A.3d 797 (2011), this Court stated clearly:

> [T]he granting of a mistrial is an extraordinary remedy that should only be resorted to under the most compelling of circumstances.

In Drake and Charles v. State, 186 Md. App. 570, 587, 975 A.2d 204 (2009), reversed on other grounds, 414 Md. 726, 997 A.2d 154 (2010), Judge Deborah Eyler observed:

> A mistrial is an extraordinary remedy and should be granted only if necessary to serve the ends of justice.

*See also* Klauenberg v. State, 355 Md. 528, 555, 735 A.2d 1061 (1999); Hunt v. State, 321 Md. 387, 422, 583 A.2d 218 (1990). As this Court noted in Quinones v. State, 215 Md. App. 1, 18, 79 A.3d 381 (2013):

Thus, unless the trial court's ruling is far away from any center mark imagined or is considered beyond the fringe of what the reviewing court deems minimally acceptable, <u>a trial court's ruling generally will not be deemed to be an abuse of discretion by the appellate court</u>.

(Emphasis supplied.)

## A Motion For A Mistrial:
## Who Makes The Call?

The unavoidable question of whether a trial has, distressingly, encountered a patch of rough water or has, more direly, actually struck an iceberg is one that unavoidably must be made by the captain of the ship. As the Maryland Supreme Court explained in <u>Cooley v. State</u>, 385 Md. 165, 174, 867 A.2d 1065 (2005):

> <u>A trial judge is afforded considerable discretion in deciding a motion for mistrial</u>, and in a case involving a question of prejudice which might infringe upon the right of the defendant to a fair trial, <u>that decision is reviewable</u> on appeal to <u>determine whether or not there has been as abuse of that discretion by the trial court in denying the mistrial</u>.

(Emphasis supplied.)

The Maryland Supreme Court similarly observed in <u>Simmons v. State</u>, 436 Md. 202, 212, 81 A.3d 383 (2013):

> [T]he trial judge is far more conversant with the factors relevant to the determination than any reviewing court can possibly be and, therefore, <u>we review the trial judge's grant of a mistrial for abuse of discretion</u>.

(Emphasis supplied.)

In <u>State v. Hawkins</u>, 326 Md. 270, 278, 604 A.2d 489 (1992), Judge Orth articulately explained the reason for extending great deference to the trial judge in measuring the degree of the trial damage:

> The fundamental rationale in leaving the matter of prejudice *vel non* to the sound discretion of the trial judge is that <u>the judge is in the best position to</u>

3

evaluate it. <u>The judge is physically on the scene, able to observe matters not usually reflected in a cold record</u>. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, <u>the judge has his finger on the pulse of the trial</u>.

(Emphasis supplied.)

In this case, Judge Oesterreicher's finger was firmly on the pulse of the trial. This Court spoke of the value of such sensitive awareness in <u>Allen v. State</u>, 89 Md. App. 25, 42-43, 597 A.2d 489 (1991):

<u>The record must compellingly demonstrate 'clear and egregious prejudice to the defendant'</u> to warrant such a dramatic measure. <u>Because a trial judge is in the best position to evaluate</u> whether or not a defendant's right to an impartial jury has been compromised, <u>an appellate court will not disturb the trial court's decision on a motion for a mistrial or a new trial absent a clear abuse of discretion</u>.

(Emphasis supplied.)

### An Exasperatingly Convoluted Glitch

The mishap at issue in this contention was the result of an inadvertent error in police bookkeeping. It was an error that is far more challenging to describe verbally than to resolve legally. It was only a glitch, but it was an exasperatingly convoluted glitch. On August 15, 2021, the Westminster Police Department responded to an anonymous 911 call reporting a domestic dispute at 81 ½ Pennsylvania Avenue in Westminster. Detective Nolan Carbaugh and Sergeant Adam Laser were the first to arrive at the scene, followed almost immediately by Corporal Alexander DeAngelis. Only Detective Carbaugh and Corporal DeAngelis testified at trial. Detective Carbaugh was the primary investigator of the case.

4

The basic division of investigative labor resulted in Detective Carbaugh's arresting the appellant and initially questioning him. It was Corporal DeAngelis, on the other hand, who interviewed the assault victim, Ms. G.[1] It was Corporal DeAngelis who not only interviewed Ms. G. at the scene but who photographed her injuries. According to Detective Carbaugh, he himself did not "make contact" with or speak to Ms. G. Carbaugh depended entirely on DeAngelis in that regard.

When an incident involving domestic violence is investigated, Westminster police administrative regulations require that the investigating officer fill out and file what is labelled a Maryland Domestic Violence Supplemental. Basically, this is a two-page form to be signed by the chief investigating officer. In some cases, cases involving choking, however, it also includes a third and a fourth page, labelled a Strangulation Supplement.[2]

The first page of the report records the basic facts of the investigation. The second page provides a body diagram on which the complaining witness can mark places on the body where the complaining witness believes that he or she was injured. The third and fourth pages of the report now in issue are the Strangulation Supplement. The third page (the first page of the Strangulation Supplement) poses a series of questions and records the complainant's responses to those questions. There is no controversy with respect to those first three pages of the ultimate four-page report and we may comfortably forget them.

---

[1]    We will refer to the assault victim as "Ms. G." throughout this opinion.

[2]    Presumably, there might be other supplements depending on the modality of the domestic violence, such as a Firearms Supplement or a Poison Supplement.

5

The entire present controversy swirls about what was recorded (or, more significantly, what was not recorded) on the fourth and final page of the four-page police report (the second page of the Strangulation Supplement). At the very bottom of the page, three non-controversial check marks are recorded. To the question, "Was victim evaluated by Medics?," the word "Yes" was circled. The medic's number was given as 37. To the question "Was victim transported to hospital/ or did victim seek medical treatment?," the word "No" was circled.

The entire present controversy is centered on the top 25% of that final page. That quarter of a page is led off by the explanation: "The following injuries were observed on the following locations." There then follow, in tightly packed fine print, ten groups of boxes to be checked under the ten body locations: Face, Eyes/Eyelids, Nose, Behind Ear, Mouth, Under Chin, Chest, Shoulders, Neck, and Head. The boxes to be checked for a more detailed description under those ten body locations then number a grand total of 40 boxes to be checked. This top quarter of the fourth page of the Police Report was left totally blank, and therein lies our entire mistrial controversy.

As we have already indicated, it was Detective Nolan Carbaugh who was the officer in charge of this investigation. At the crime scene, it was Detective Carbaugh who stopped the appellant, ultimately arrested him, and then transported him to the station house. It was Corporal Alexander DeAngelis, on the other hand, who made contact with and who interviewed the assault victim, Ms. G. Detective Carbaugh had no meaningful contact with the assault victim at all.

6

At the station house, however, it was Detective Carbaugh, as chief investigating officer, who had the responsibility to fill out and to submit the Domestic Violence Report. As was explained later by clarifying testimony, Detective Carbaugh necessarily depended on Corporal DeAngelis for some of the information he put in the report, particularly all of the information concerning Ms. G. It was Detective Carbaugh, who prepared the overall Domestic Violence report, who signed that report on its first page, and who submitted the report to a Sergeant White, who had to approve the reports that were submitted in terms of their form (number of pages, e.g.). Pursuant to Maryland Rule 4-263(d)(3) dealing with Discovery in the Circuit Court, the State then furnished to the appellant a copy of that four-page Domestic Violence Supplement (including the two pages labeled Strangulation Supplement).

Armed with that Strangulation Supplement, the defense used it effectively to conduct a scorching cross-examination of Detective Carbaugh. When questioned about any visible injuries to the person of the assault victim, Detective Carbaugh, who had seen photographs of the assault victim, thought that he could recall a redness to the area of her neck and face. Bombarded with questions about why no such boxes were checked on his Strangulation Supplement, however, the detective could only acknowledge that those boxes had been left blank. Ultimately, he could only stammer out that he himself had never observed the assault victim. He explained that in filling out that part of the Supplement he had relied on information supplied to him by Corporal DeAngelis.

In any event, the boxes indicating injuries to Ms. G. had been left blank and the State was accordingly embarrassed. The blank boxes, brought out by the cross-

7

examination, inevitably compromised the credibility of Detective Carbaugh and it detracted from the State's contention that Ms. G. had actually suffered injuries. Detective Carbaugh tried to explain, "Since I did not observe the injuries at first [hand], I was not able to check them off."

A fuller explanation of the State's bookkeeping blunder only came later, unexpectedly. Corporal DeAngelis took the stand and testified after Detective Carbaugh. At one point in his testimony, he testified that he had, indeed, observed injury to Ms. G.'s face and neck area and had checked the appropriate boxes on the form that he himself had filled out. He then further testified that the Strangulation Supplement he had filled out, in his own handwriting, was not the one that had been ultimately filed by Detective Carbaugh. Corporal DeAngelis offered the speculation that his one or two final pages had somehow been lost and that Detective Carbaugh, required to submit a four page Domestic Violence Supplement, had had to append two additional pages, with the finely detailed set of boxes for observed injuries left blank.

The discrepancy was to some extent cleared up and the motion to declare a mistrial followed. It was ultimately denied with the appellant now claiming that the denial was reversible error. The defense was less than gentle in characterizing what seems to have been nothing more than a bureaucratic oversight: "The State had provided <u>false evidence</u>;" "the <u>fraudulent nature</u> of the Strangulation Supplement;" "the State gave him a <u>false document</u> in discovery;" "some <u>evidence was fabricated</u>." "Misleading" would have been a more apt description than "fraudulent" or "fabricated," but appellate briefs are seldom that modulated.

## The Absence Of Bad Faith

Judge Oesterreicher decided that the State was, of course, responsible for the entire misunderstanding, but that its botched report had been an inadvertent mistake on its part and was not the result of any insidious or nefarious plot to subvert the defense of the case. As this Court pointed out in Raynor v. State, 201 Md. App. 209, 228, 29 A.3d 617 (2011), the absence of bad faith on the part of the State is a factor to be considered in assessing the appropriate sanction for a discovery violation:

> [I]n exercising its discretion regarding sanctions for discovery violations, a trial court should consider: (1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the feasibility of curing any prejudice with a continuance; and (4) any other relevant circumstances. Although the prosecutor's intent alone does not determine the appropriate sanction, bad faith on the part of the State can justify exclusion of evidence or serve as a factor in granting a harsher sanction.

(Emphasis supplied.)

It is obvious in this case that the leaving of the collection of boxes to be checked on the final page of the Strangulation Supplement completely unchecked was not an act of deliberate or calculated sabotage on the part of the State. The blank answers actually helped the defense dramatically in its cross-examination of Detective Carbaugh. It certainly did not help the State in any way. There was no conceivable way that the State could have intended to sabotage the defense by furnishing blank answers, a tactic that could only have helped the defense and hurt the State. As a sinister plot on the part of the State, it would have been self-evidently stupid. Indisputably, therefore, there was no bad faith involved in

9

leaving the collection of boxes unchecked. It may have been careless, but it was not calculated. That is only one factor, but it is a factor.

The circumstances in Raynor v. State were remarkably parallel to the circumstances in the present case. Raynor moved for a mistrial "because the State failed to disclose before trial eighty-nine emails between the victim and the police." 201 Md. App. at 225. Raynor "claimed that he was entitled to a mistrial because the emails should have been disclosed before trial and could have been used as impeachment evidence during his cross-examination of the victim." Id. at 226. Raynor's accusation of the State's behavior in that case is an echo of the appellant's charge against the prosecution in this case:

> Appellant's trial counsel accused the State of deliberately withholding the emails, alleging that he had made an oral request for emails before trial and that the State did not respond to that request even though the assistant state's attorney knew about the emails because she had been included in some of the correspondence.

Id. at 226. (Emphasis supplied.)

The Assistant State's Attorney in that case "asserted that she did not willfully violate the discovery rules," explaining that "she had simply forgotten about any emails she had sent or received." Id. at 226. The trial judge "found this representation to be credible.":

> While agreeing with appellant that the emails should have been provided before trial, the circuit court denied his motion for a mistrial, finding no deliberate discovery violation by the State.

Id. (Emphasis supplied.)

As in the present case, Judge Oesterreicher gave the defense the full opportunity to explore just why the State's mistake had been made and then to go forward using the

corrected information. The <u>Raynor</u> opinion then quoted with approval from <u>Thomas v.</u> <u>State</u>, 397 Md. 557, 571, 919 A.2d 49 (2007):

> The most accepted view of discovery sanctions is that <u>in fashioning a</u> <u>sanction, the court should impose the least severe sanction that is consistent</u> <u>with the purpose of the discovery rules.</u>[3]

(Emphasis supplied.)

In assessing the denial of the defense motion for a mistrial, the <u>Raynor</u> Court concluded:

> As for the cause of the violation, <u>the circuit court found that the assistant</u> <u>state's attorney simply forgot about the emails she had sent and received</u>, and <u>we have no reason to conclude that that finding was clearly erroneous.</u>

<u>Id.</u> at 229. (Emphasis supplied.) Judge Oesterreicher's finding that the glitch in the present case was similarly an inadvertent mistake was similarly not clearly erroneous. Her final ruling that a mistrial would not be declared, therefore, was accordingly not an abuse of discretion.

## Precise Pleading Calls For More Than Undifferentiated Angst

That finding that the failure to check the boxes (or properly to report that some of the boxes had been checked) had been an inadvertent error and not an instance of a bad

---

[3]     The <u>Raynor</u> Court also observed that sometimes an aggrieved defendant declines the limited remedy that would correct the error and opts for a mistrial instead:

> [T]he Court of Appeals has warned that, if a defendant declines a limited remedy that would serve the purpose of the discovery rules and instead seeks the greater windfall of an excessive sanction, the "double or nothing" gamble almost always yields "nothing."

<u>Id.</u> at 228.

faith effort to subvert justice could in and of itself be dispositive of our holding that Judge Oesterreicher did not abuse her discretion in denying the mistrial motion. It is nonetheless interesting in this case to ruminate for an idle moment or two over what precisely the appellant claims the error to have been in this case. It was a ticklish pleading problem on his part that called for more than undifferentiated angst.

Ironically, the prejudice to the defense that the appellant claims to have suffered resulted not from the original error per se but rather from the correction of that error. What the appellant asked to be kept from the jury was not the erroneous Strangulation Supplement form itself, which, albeit in error, had been effectively used by the appellant to cross-examine Detective Carbaugh. What the appellant wanted kept from the jury was the testimony of Corporal DeAngelis, given initially out of the presence of the jury, which corrected that original mistake. The appellant would have preferred that the error remain uncorrected. It was the correction of the error that the appellant now claims was prejudicial to his defense, not the original error itself. The appellant did not want to lose what had initially appeared to be a partial victory. The appellant's actual objection was not to the error, but to the correction of the error. Is there a difference?

What should be done in such a case? Was it wrong to correct the error? On the one hand, it may logically be maintained that the party responsible for the error itself is also responsible for creating the need to correct the error. On the other hand, the attenuation of the chain of causation is a definite ameliorating factor in assessing the appropriate response to the error. This multi-layered problem could well be an interesting subject for analysis in

12

a Platonic dialogue. Fortunately, we need not anguish over it. We will deal with the appellant's objection as if it were properly before us.

## The Absence Of Significant Prejudice: "Calm Sea And Prosperous Voyage"

In arriving at the ruling that a mistrial would not be declared in this case, even more important than a finding of no bad faith in committing the original error was the additional finding that the appellant had not suffered an irremediable amount of toxic prejudice, if indeed any prejudice at all. For a judge to declare a mistrial is tantamount to the captain ordering all hands to "Abandon Ship!" What the crisis demands is a calming sense of balance. Has the trial been thrown off balance by a patch of rough water or has it actually hit an iceberg? Have we encountered a trial glitch or have we suffered an irremediable miscarriage of justice? Not some damage, but an irremediable miscarriage of justice? Every mishap is not a catastrophe. There is a big difference. At the most fundamental level, was this ship salvageable? One of the chief dangers to be avoided at such a moment of crisis is that of overreaction.

In assessing the court's response to the appellant's motion for a mistrial, the dispositive question is not whether an error occurred. Nor is it normally a question of how much prejudice the appellant suffered. The dispositive question is whether the defendant has suffered such an extreme degree of prejudice that it is no longer possible to secure a fair trial. Molter v. State, 201 Md. App. 155, 178-79, 28 A.3d 797 (2011). *See also* Kosh v. State, 382 Md. 218, 226, 854 A.2d 1259 (2004) ("The determining factor as to whether

13

a mistrial is necessary is whether the prejudice to the defendant was so substantial that he was deprived of a fair trial.").

In assessing the totality of the trial mishap, Judge Oesterreicher made several dispositive judgments. First and foremost was the dominant reality that the appellant suffered no harm from the error. The error itself was to the obvious detriment of the State and to the undeserved advantage of the appellant. The incontrovertible error was to have forwarded to the appellant the four-page Domestic Violence Supplement containing, at the top of the fourth page, the set of completely unchecked boxes seeming to reflect the injuries to the assault victim, Ms. G. Those unchecked boxes, left unchecked in error, gave the false impression that Ms. G. had been uninjured. That error was exploited by the appellant, to his obvious advantage, in the defense's searing cross-examination of Detective Carbaugh. In the very words of the appellant's brief, "Over the course of 20 questions, the defense reinforced before the jury that the Strangulation Supplement reflected that the police did not observe any injuries on Ms. G." The defense brief also asserted that the unchecked boxes "undermin[ed] Deputy Carbaugh when he tried to assert that a photo [of] Ms. G. depicted a 'small red mark' on her cheek." The report containing those unchecked boxes was clearly used to help the appellant and to undermine the credibility of Detective Carbaugh.

It was only later that the testimony of Corporal DeAngelis brought to light the source of the mistake. In probing the provenance of the mistake, both the appellant and the State were given the opportunity to examine Corporal DeAngelis, first outside the presence of the jury. It is clear that the appellant's motion for a mistrial was based upon the original

14

mistake in filing the Strangulation Supplement. In appellate argument, however, the appellant attributes any prejudice he suffered not to the original error <u>per se</u> but rather to Judge Oesterreicher's allowing Corporal DeAngelis to explain, in his later testimony before the jury, just how that original mistake occurred. He argues, in effect, that the prejudice he suffered was in not being allowed to continue to enjoy a benefit that he was not entitled to in the first instance. The appellant, who had at least temporarily, benefited from an error, lost that benefit when the truth came out. If that was prejudice, it was very small-bore prejudice. He was denied the continued enjoyment of an error in his favor.

The conclusion that the appellant suffered no prejudice from the original error itself is fully supported by the reasoning of this Court in <u>Georges v. State</u>, 252 Md. App. 523, 530, 259 A.3d 249 (2021):

> <u>When the issue on appeal is the declaration vel non of a mistrial, the critical measurement is that of a toxic amount of error, not error per se but a toxic amount of error</u>. A factual predicate of no error, of course, would support a conclusion that there was no such amount of toxic error. <u>Equally supportive of that same conclusion, however, would be a factual predicate that there was, or might have been, only a small or non-toxic amount of error</u>. It is, therefore, a matter of sublime unconcern whether the partial predicate for a holding that a mistrial was not compelled was that of no error or that of only small error.

(Emphasis supplied.)

Quite aside from the merits of how this contretemps was resolved, of which we approve incidentally, there was clearly no irremediable prejudice of the extreme degree that calls for a declaration of mistrial. This glitch was, at worst, a patch of rough water and not the hitting of an iceberg. Even for defense counsel to have to readjust the defensive strategy is not an adequate reason to "Abandon Ship."

15

Our response to the appellant's first contention, therefore, is to hold that the trial in this case had not hit an iceberg and that Judge Oesterreicher, therefore, acted with appropriate restraint in not issuing the order, "Abandon Ship." There was no fatal impediment to this trial's continuing to enjoy a "Calm Sea and Prosperous Voyage."[4]

## The Mission Of Careful Redaction

That calm sea, however, was soon roiled by the first of the appellant's two hearsay complaints. If our consideration of this hearsay contention is to have a theme, it should be "The Mission of Careful Redaction."

The out of court declarant here was a concerned neighbor of Ms. G. The vehicle for the out of court assertion here was an emergency 911 call by that neighbor to the police. The core content of that out of court assertion was, "There's a man beating the shit out of a woman!"[5] The dramatic content and vivid phraseology of that outburst communicated to all hands the character of the assertion as both an excited utterance and as a present sense

---

[4] Felix Mendelssohn, "*Calm Sea and Prosperous Voyage*," A Concert Overture (1828).

[5] In his nationally recognized series of lectures on the law of evidence, the late Professor Irving Younger provided a definition of an excited utterance that, in addition to being entertaining, actually provides very helpful practical guidance:

> You can always recognize an excited utterance when you hear one because it begins with, "My God," and ends with an exclamation point!"

That, <u>par excellence</u>, described the excited utterance here, which was, in effect: "My God, there's a man beating the shit out of a woman!!!" *See* <u>Morten v. State</u>, 242 Md. App. 537, 546, 215 A.3d 846 (2019).

impression, each a well-recognized exemption from the Rule Against Hearsay. The need for the exclamation point was never in doubt.

The perplexing hearsay problem involved in this contention is not that of spotting the inadmissible hearsay that should be excluded pursuant to the Rule Against Hearsay. Nor is it the spotting of the admissible hearsay that qualifies as an exception to the Rule Against Hearsay. Both the appellant and the State are not in any serious dispute about such specific determinations that can easily be decided, one by one, in microcosm. The special problem here is that of how to handle, in macrocosm, a mixed bag of good and bad hearsay combined.

The appellant proffers an absolutist approach whereby any contaminated hearsay in the totality should condemn the entire totality to exclusion. Logically if not legally, that is a notion just as flawed as would be the converse absolutist approach that the presence of some admissible hearsay in the totality should automatically qualify the entire totality for admission. Our ideal solution, on the other hand, should be to find a balanced approach whereby the bad hearsay is excluded from evidence but the good hearsay is admitted into evidence. That is the goal of sensitive redaction.

During a motion in limine at the start of the trial, the defense moved to exclude two 911 calls on the grounds that they were allegedly hearsay. The State agreed that they were, indeed, hearsay, but argued for the application of two exemptions from the Rule Against Hearsay. Judge Oesterreicher listened to both 911 calls and ruled that the second of those two calls would, indeed, be excluded from evidence. It need no longer concern us. We turn our attention exclusively to that first call.

17

## The Rule Against Hearsay

The simple but universally recognized definition of hearsay cannot be improved upon: An out of court assertion offered in court for the truth of the thing asserted. Maryland Rule 5-802 provides very simply:

> Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, **HEARSAY IS NOT ADMISSIBLE**.

(Emphasis supplied.) Maryland Rule 5-802 is derived from Federal Rule of Evidence 802.

The Rule Against Hearsay is, indeed, one of the venerable evidentiary building blocks of our common law. As Dean John Henry Wigmore explained in "The History of the Hearsay Rule," 17 Harv. L.Rv. 437, 437 (1904):

> The history of the Hearsay Rule, as a distinct and living idea, begins only in the 1500's, and it does not gain a complete development and final precision until the early 1700's.

All parties are agreed that the 911 call now in issue was classically hearsay. As such, it was presumably inadmissible unless it qualified for one or more of the exemptions from the Rule Against Hearsay provided by Maryland Rule 5-803. We now turn to two of those exemptions.

## An Excited Utterance

It is Rule 5-803 that lists the exceptions to the Rule Against Hearsay in circumstances where the unavailability of the declarant is not required. Rule 5-803(b)(2) leads off the list of recognized exceptions:

> (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

(Emphasis supplied.) That Maryland Rule is based on Federal Rule of Evidence 803(2).

18

At 6 <u>Wigmore on Evidence</u>, Sect. 1747, at 195 (Chadbourn rev. 1976), Dean

Wigmore explained the rationale for the Excited Utterance exception:

> This general principle is based on the experience that, <u>under certain external circumstances</u> of physical shock, <u>a stress of nervous excitement may be produced which stills the reflective faculties</u> and removes their control, <u>so that the utterance which then occurs is a spontaneous</u> and sincere <u>response</u> to the actual sensations and perceptions already produced by the external shock. Since <u>this utterance is made under the immediate and uncontrolled domination of the senses</u>, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, <u>the utterance may be taken as particularly trustworthy</u> (or at least as lacking the usual grounds of untrustworthiness), and this as expressing the real tenor of the speaker's belief as to the facts just observed by him; <u>and may therefore be received as testimony to those facts</u>.

(Emphasis supplied.)

<u>McCormick on Evidence</u>, Sect. 297, at 854-55, (E. Cleary 3d Ed. 1984), is in full

accord:

> First, <u>there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer</u>. Second, <u>the statement of the declarant must have been a spontaneous reaction to the occurrence</u> or event <u>and not the result of reflective thought</u>.

(Emphasis supplied.)

As Maryland, and the nation at large, emerged from a long period of explaining

exceptions to the Rule Against Hearsay by the now superseded and awkward concept of

<u>res gestae</u>, the first significant opinion of the Maryland Supreme Court to refer to the

Excited Utterance exception directly with that terminology was <u>Mouzone v. State</u>, 294 Md.

19

692, 452 A.2d 661 (1982).[6] Judge Cole explained the generative rationale undergirding the

Excited Utterance exception:

> The essence of the excited utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence. The rationale for overcoming the inherent untrustworthiness of hearsay is that the situation produced such an effect on the declarant as to render his reflective capabilities inoperative.

(Emphasis supplied.)

In Cassidy v. State, 74 Md. App. 1, 17-23, 536 A.2d 666 (1988), this Court

examined the Excited Utterance exception in all of its many aspects, beginning at 74 Md.

App. 17:

> The essential rationale for the Excited Utterance Exception is spontaneity arising immediately from the exciting event and not yet having abated when the utterance is made.

(Emphasis supplied.) *See also* State v. Harrell, 348 Md. 69, 76-78, 702 A.2d 723 (1997).

## The Present Sense Impression

The second, and closely related, exception to the Rule Against Hearsay in this case

is the Present Sense Impression. Maryland Rule 5-803(b)(1) describes this exception to the

Rule Against Hearsay:

---

[6] Prior to 1982, the Maryland caselaw, dating all the way back to Wright v. State, 88 Md. 705, 41 A. 1060 in 1898, had been reaching correct decisions but had been explaining those decisions by what has since been recognized as a confusing and now antiquated theory. For a quick overview of the Res Gestae saga in hearsay analysis, see Cassidy v. State, 74 Md. App. at 9-16. *See also* Moylan, Res Gestae, or Why Is That Event Speaking and What Is It Doing in My Courtroom?, 63 A.B.A. Journal 968 (1977).

20

(1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

This rule is derived from Federal Rule of Evidence 803.

There is a very significant overlap between the Excited Utterance and the Present Sense Impression. The Excited Utterance generally is describing an event which the excited declarant is witnessing firsthand. In the case of Present Sense Impressions generally (but not always), the declarant who is expressing the impression is frequently in an excited state of mind.

Slowly but surely, however, the Present Sense Impression acquired recognition and acceptance as an exception in its own right and did not invariably require that the declarant be in a state of excitement. In 2 <u>McCormick on Evidence</u>, Sect. 271 (8th ed. 2022), Dean McCormick observed:

> <u>The courts generally did not rush to the support of the proposed exception for unexcited statements of present sense impressions</u>. A considerable number continued to admit contemporaneous statements under <u>res gestae</u> language without emphasis on the presence or absence of an exciting event. <u>In a large proportion of these decisions, an arguably exciting event was present</u>. However, <u>cases recognizing the exception for unexcited statements of present sense impressions began to emerge</u>.

(Emphasis supplied.)

The case that gave national recognition to the Present Sense Impression was <u>Houston Oxygen Co. v. Davis</u>, 139 Tex. 1, 161 S.W.2d 474 (1942). <u>McCormick</u>, <u>id.</u>, described <u>Houston Oxygen</u>, "Although an apparently exciting event transpired, the opinion disclaimed reliance upon it and instead expressly based its decision upon the exception for unexcited declaration of present sense impression."

21

In Lynn McLain, <u>Maryland Evidence</u>, Sect. 803(1), Professor McLain described the exception as it is currently applied in Maryland:

> In order for a statement to be admissible as a present sense impression, <u>there is no requirement that the declarant have been startled, excited, or upset about the event perceived</u>. This is as it should be, because there is support for the position that unexcited statements tend to be more accurate than excited ones. Thus <u>a sportscaster giving a "play by play" account is stating present sense impressions, as is a police officer speaking into a wire and describing what she is seeing</u>.
>
> <u>The statement must have been made either during the declarant's perception of the event or condition in question or immediately afterwards</u>. Anything more than a slight lapse of time between the event and the statement will make the statement inadmissible.
>
> <u>Before a present sense impression will be admissible, there must be a showing that the declarant was speaking from first-hand knowledge</u>.

(Emphasis supplied.) *See also* <u>State v. Jones</u>, 311 Md. 23, 30-32, 532 A.2d 169 (1987).

The formal recognition in Maryland of the Present Sense Impression was in the monumental opinion of Judge McAuliffe for the Supreme Court in <u>Booth v. State</u>, 306 Md. 313, 508 A.2d 976 (1986). After an extensive survey of the gradual emergence of the Present Sense Impression out of the earlier <u>res gestae</u> analysis, Judge McAuliffe concluded:

> As observed by the Advisory Committee to the Federal Rules, <u>the excited utterance and present sense impression exceptions overlap</u>, <u>though based on somewhat different theories</u>. The underlying rationale of the two exceptions are similar, i.e., <u>both preserve the benefit of spontaneity in the narrow span of time before a declarant has an opportunity to reflect and fabricate</u>. We conclude that the present sense impression exception to the hearsay rule rests upon a firm foundation of trustworthiness, and <u>we adopt it in the form in which it appears at Fed.R.Evid. 803(1)</u>.

306 Md. at 324. (Emphasis supplied.)

22

## The Allocation Of The Burden Of Proof

The allocation of the burden of proof for a proposition is invariably imposed on the proponent of that proposition. In dealing with questions of hearsay, however, the allocation of the burden of proof may frequently shift in the course of the analysis for the obvious reason that the identification of the proponent of the proposition may correspondingly shift. Generally speaking, the defendant will be the first proponent, proposing that the Rule Against Hearsay be invoked to exclude challenged evidence as hearsay. That is the exclusionary burden. If the defendant prevails, however, the identity of the proponent may immediately shift to the State, as it then proposes that the challenged evidence nonetheless be admitted pursuant to one or more of the exceptions to the Rule Against Hearsay. This is the inclusionary burden. It is for this reason that casual statements in the caselaw about the allocation of the burden of proof must be carefully examined. Is the appellate opinion referring to the allocation of the burden of proof at three minutes into the controversy or at ten minutes into the controversy, when the issue has shifted from the Rule to the exemption from the Rule? One must be careful before lifting words off the page.

In <u>Cassidy v. State</u>, 74 Md. App. 1, 7, 536 A.2d 666 (1988), this Court explained:

> <u>In allocating the burden of proof, it is important to begin with the Hearsay Rule itself and not with its converse</u>. The full name of the rule is <u>The Rule Against Hearsay</u>. Although subject to multitudinous exceptions, <u>the Rule</u>, in its essence, <u>is a rule of exclusion</u>. <u>The essential thrust of Federal Rule of Evidence 802, for example, is one of exclusion, not of inclusion</u>: 'Hearsay is not admissible except as…'

(Emphasis supplied.) The tide, however, may immediately turn:

> When urging an exception to a rule of exclusion, however, <u>the burden is upon the proponent of the exception</u>. The correct procedural posture is, "Hearsay will be excluded, unless the proponent demonstrates its probable trustworthiness." Maryland, in the common law tradition, is more rigorous and orthodox in its approach to hearsay exceptions. <u>A proponent will not satisfy the rule by showing generalized indicia of trustworthiness but must qualify under one of the clearly identifiable and classically recognized exceptions</u>.

<u>Id.</u> (Emphasis supplied.)

In this case, the appellant's time as proponent of excluding the 911 call as hearsay was momentary, as all parties immediately agreed that the 911 call was, indeed, hearsay and, as such, would presumably be excluded. The burden of proof immediately shifted to the State as the proponent of both the Excited Utterance exception and the Present Sense Impression exception to the Rule Against Hearsay. The State then successfully carried that burden – in significant part but only in part. Parts of the 911 call were, indeed, excited utterances and/or present sense impressions. Other parts of the 911 call, on the other hand, did not qualify as exemptions from the Hearsay Rule's exclusionary ban. Sorting out the wheat from the chaff then became Judge Oesterreicher's mission of careful redaction.

**The Redaction**

Judge Oesterreicher, with the vigorous participation of counsel for both the appellant and the State, undertook a meticulous examination of the phone call, line by line and at times word by word, and produced a surgical redaction of the bad hearsay from the good hearsay.

With respect to the first 911 call, a part of which was ultimately admitted into evidence, the out of court declarant, the concerned neighbor, was a female. Present with

her (or near her) during the call was a male, who was apparently the declarant's husband. Periodically, he would interject, sometimes to clarify something his wife had said, sometimes to answer a question posed by her. In the language of the theatre, he was the phenomenon generally referred to as "Voices Off." This combination on one end of the line created what we have called a mixed bag. The telephone call in issue, to wit, the out of court assertion in issue, consisted of excited passages by the female caller based on her present sense impression interrupted periodically by the other passages that did not qualify as exemptions from the ban against hearsay.

A large part of what was excised was conversation to which the male voice contributed significantly. It was discussion largely concerning the identity of Ms. G. and the appellant – at times describing the race of the two combatants plus a description of what the male assailant was wearing. The excising of this portion of the out of court assertion was essentially insignificant, however, because the identification of the two parties was never in dispute. Ms. G. was indisputably the assault victim. Although the appellant denied hitting Ms. G., his identity as the second party to the prolonged and angry dispute was never in question. The identification of the two parties by the 911 call was completely superfluous.

The significance of that part of the 911 call that the court found to have been admissible, on the other hand, highlighted the severity of the attack and the prolonged nature of the attack. It consisted of observations almost certainly witnessed directly by the out of court declarant. What Judge Oesterreicher ruled to be admissible hearsay was

25

quantitatively relatively limited. As she explained her ruling, she summarized those parts of the 911 call that she found to be admissible:

> What I wrote down that I believe is admissible under the excited utterance and present sense impression is I need the police; it is across the street from 86 ½ Avenue, but we are not the ones; my God, they're not answering, which is when the phone is ringing for Westminster City to pick up; I need the police; there's a guy beating the shit out of a woman; there's kids involved; there's a male hitting a female.

In this case, the careful line by line factfinding by Judge Oesterreicher as to which parts of the 911 call were or were not excited and as to which parts of the call were or were not a present sense impression was not clearly erroneous. Based on that careful factfinding, Judge Oesterreicher's ultimate ruling that the 911 call, as thus redacted, would be received in evidence was not an abuse of discretion.

## A Prudent Solution:
## Salvage What Can Be Salvaged

Challenged by a mixed bag of both admissible and inadmissible hearsay from a single out of court declarant, the appellant simplistically urged an "all-or-nothing" approach. Not surprisingly, he opted, moreover, for that "all-or-nothing" approach's "nothing" alternative. Ideally, however, a fully informed trial both welcomes and needs a more prudent approach by which the bad hearsay may safely be jettisoned even as the good hearsay is economically salvaged. That, of course, is the mission of careful redaction, a mission we hereby hold to have been commendably and carefully accomplished in this case. We affirm Judge Oesterreicher's evidentiary ruling.

**Self-Defense:**
**A Contention Left In The Starting Gate**

The appellant's third contention is that Judge Oesterreicher erroneously failed to give the jury an instruction on self-defense. It is a fascinating contention for the intriguing reason that it never even makes it out of the starting gate. In failing to do so, however, it focuses attention on a circumstance so fundamental that it is invariably taken for granted. As a defensive theory, perfect self-defense is, of course, a justification, under certain well-defined circumstances, for a defendant's responsive assaultive behavior. In addition to all four required factors in its multi-factored paradigm, the entitlement to a defense of self-defense also requires something else so basic that it can easily be overlooked. As a justification for what would otherwise be an assaultive act, self-defense requires by definition an act that needs justification. A justification for an assaultive response cannot exist without an assaultive response that needs justification. There is no such thing as a justification for nothing. As a legal phenomenon, justification does not simply hover, untethered, in a vacuum. The justification must be a justification for some particularized assault. In this case, however, it was not. It simply hovered as a non-particularized generality. In asserting self-defense, the appellant must tell us what particular act he seeks to justify.

**A Multi-Factored Paradigm**

It behooves us initially to set out the standard against which we must measure the appellant's argument. In <u>Jones v. State</u>, 357 Md. 408, 422, 745 A.2d 396 (2000), Judge

27

Harrell set out the full multi-factored paradigm for complete or perfect self-defense in a non-deadly context:

> (1) the defendant actually believed that he or she was in immediate or imminent danger of bodily harm;
>
> (2) the defendant's belief was reasonable;
>
> (3) the defendant must not have been the aggressor or provoked the conflict; and
>
> (4) the defendant used no more force than was reasonably necessary to defend himself or herself in light of the threatened or actual harm.

*See also* State v. Martin, 329 Md. 351, 357, 619 A.2d 992 (1993); Dykes v. State, 319 Md. 206, 211, 571 A.2d 1251 (1990); State v. Faulkner, 301 Md. 482, 485-86, 483 A.2d 759 (1984).

An instruction explaining self-defense must be given to the jury, if requested, whenever the actual evidence produced at the trial is sufficient, with respect to each and every one of those four factors, to support such a defense. In Dishman v. State, 352 Md. 279, 292, 721 A.2d 699 (1998), the Maryland Supreme Court explained:

> The determination of whether an instruction must be given turns on whether there is any evidence in the case that supports the instruction. The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge. The task of this Court on review is to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a prima facie case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.

(Internal citations omitted.) (Emphasis supplied.) *See also* Bazzle v. State, 426 Md. 541, 549-52, 45 A.3d 166 (2012).

28

Each and every one of these four factors must be satisfied by the evidence in the case in order for a jury instruction on self-defense to be required. The full matrix of the multi-factored self-defense paradigm absolutely precludes a claim of hypothetical self-defense such as: "I did not do it but even if I had done it, it would have been in self-defense." That is not an acceptable plea. The fourth factor of the multi-factored paradigm would ipso facto foreclose such Orwellian doublespeak. One must acknowledge the conduct one seeks to justify.

With respect to a self-defense instruction, the allocation of the burden of proof has also been firmly established. In State v. Evans, 278 Md. 197, 207-08, 362 A.2d 629 (1976), the Maryland Supreme Court stated unequivocally:

> The burden of initially producing some evidence on the requested instruction (or of relying upon evidence produced by the State) sufficient to give rise to a jury issue with respect to the instruction, is properly cast upon the defendant.

(Emphasis supplied.)

## Self-Defense:
## A Cause-And-Effect Relationship

A self-defense scenario is, by definition, a cause-and-effect relationship. An allegedly provocative action by the victim produces an allegedly responsive reaction by the defendant, which may or may not have been justified. A cause-and-effect relationship, moreover, ordinarily takes place within a reasonably tight time sequence. It does not spread out over several hours. The same provocative cause that might produce a justified effect ten or fifteen seconds after it occurs would almost certainly not produce a justified effect ten or fifteen minutes after it occurs.

This necessity for a tight time sequence makes it imperative that the proponent of a self-defense claim identify the particular cause and the particular effect that he seeks to connect and to justify. The appellant here has identified neither. He argues simply that at some point in this protracted combative saga some action occurred that generally resembled or looked like a provocative cause and at some other indeterminant point some generic action occurred that generally resembled or looked like a responsive reaction. The link-up needs to be <u>in esse</u> and not simply <u>in potential</u>. The appellant, however, has made no effort to link them together in any sort of a time sequence or in any sort of a cause-and-effect relationship.

## Target Identification

The major flaw in the appellant's failure to particularize is his complete lack of any time sequence. Ordinarily in a typical self-defense scenario, there will be a readily discernible cause-and-effect relationship on display. However the cause-and-effect relationship is ultimately resolved on its merits, the alleged cause-and-effect relationship itself should nonetheless be easy to identify. There will invariably be an allegedly provocative act by the ultimate assault victim followed almost immediately by some assaultive response by the defendant. Whatever the ultimate merits, we will be dealing with a limited event (or a short sequence of two events) in a very tight envelope of time. The appellant here, however, never tells us what particular assaultive behavior he seeks to justify.

The acrimonious confrontation between the appellant and Ms. G. that was tried in this case stretched out over a period of roughly two hours. It began when Ms. G. confronted

her five-year, at least partly live-in boyfriend with accusations of his infidelity, as he lay on a couch in the living room. It progressed to an upstairs bedroom and then downstairs again. It was subject to an intermission as the appellant left the house, only to return a short time later. In the course of the total encounter, the appellant allegedly hit, choked, shoved, and threatened Ms. G. on countless occasions. On two occasions, third persons intervened to separate the appellant from Ms. G. It was, in short, a prolonged encounter consisting of many sub-incidents.

## Pinning Down Peter Pan

In attempting to ground the four required factors of the self-defense paradigm in the evidence produced by the trial, the appellant ranges back and forth over the entire two-hour saga with the carefree abandon of Peter Pan. He will follow an allegedly provocative act by Ms. G. in what might be Round Three of a fifteen round bout with an allegedly responsive assault by the appellant in Round Twelve or Thirteen. Any tighter connection between cause and effect he totally neglects. The appellant attempts to coalesce fifteen or twenty arguably provocative acts on the part of Ms. G. into a single generic provocative act and to coalesce twenty or thirty assaultive responses by the appellant into a single generic assaultive response. According to the appellant's thesis, one generic provocative act and one generic assaultive response would thus each be grounded somewhere in the trial evidence and the entire trial is then offered as one all-encompassing example of generic self-defense. A two-hour saga is thereby reduced into a two-minute condensation. That, however, is not what is meant by a jury instruction being tethered to actual trial evidence. Our problem is to find one specific and particularized act of self-defense, not an

31

amorphous glob of generic self-defense. The appellant must pin down Peter Pan with precise coordinates.

As Judge Bell (later Chief Judge Bell) wrote in State v. Martin, 329 Md. 351, 368, 619 A.2d 992 (1993):

> We hold that where the defendant's subjective belief at a particular time must be shown to generate a defense, only evidence bearing directly on that issue will suffice. Evidence of the defendant's subjective belief at some earlier time will not do.

(Emphasis supplied.)

The argument is scattershot and its argumentative framework is jerry-built. The defense argues "that although there was conflicting testimony on the record about who hit who[m] first, or who hit who[m] at all, there has been evidence, through testimony and pictures, that both parties were touched in some way unconsentingly." (Emphasis supplied.) With respect to the fear of immediate or imminent harm, the defense argues that the appellant's "testimony that he left Ms. G.'s house because he thought she might strike him again demonstrated reasonable belief that he was in immediate or imminent danger of bodily harm. If that were true, of course, why did he come back? That would be deliberately walking into danger instead of walking away from it. What is required, moreover, is not just that the defendant has such a belief but that he acted in response to it.

It is murkily unclear whether the appellant is proffering that the requested self-defense instruction should apply to one particular instance of his assaultive behavior toward Ms. G. or to all of it. In his brief, the appellant speaks in very general terms: "The

32

State introduced evidence of a use of force by Mr. Mason through the testimony of Ms. G."

His broader argument is:

> [E]vidence of both a use of force and a reasonable belief of immediate or imminent danger of bodily harm came out at trial. Ms. [G.] testified that Mr. Mason used force against her during their argument. Specifically, she stated that Mr. Mason punched her in the face, after which she hit him in the face with a fan. She also alleged that Mr. Mason pulled her down by her shirt and choked her with his hands. Ms. [G.] additionally claimed that Mr. Mason hit her after their argument spilled outside. Here, therefore, as in Bynes, the complaining witness' testimony supplied the first element necessary for the self-defense instruction.

(Emphasis supplied.)

What the appellant herein asserts as evidence of the appellant's assaultive conduct toward Ms. G., of course, would require not one claim of justifiable self-defense but at least a dozen such claims. Which of these many assaults, if any, is the appellant claiming to have been justified by having been done in self-defense? Nowhere does the appellant seek to pin his self-defense claim down. The identification of the allegedly self-defensive action, however, demands the precise targeting of a sniper's bullet and not a diffuse broadside from a blunderbuss. In the multi-factored paradigm of self-defense, the first factor is that:

> [t]he defendant actually believed that he or she was in immediate or imminent danger of bodily harm.

Jones v. State, 357 Md. at 422. In his brief, the appellant argues in this regard:

> [D]uring his direct testimony, Mr. Mason corroborated that Ms. [G.] hit him in the face with a fan, causing him to bleed, but denied hitting her before she hit him. Mr. Mason testified that he got away from Ms. [G.] after that because he thought that if he didn't, she probably would have done it again. Mr. Mason expressed his belief that a strike "always comes with more." This

33

testimony generated the <u>evidence to meet the reasonable belief element necessary for the self-defense instruction</u>.

(Emphasis supplied.)

The defendant, however, never testified that he did anything at that time in self-defense. Even if the appellant had had such a belief that he was in "immediate or imminent danger of bodily harm" (significantly, the appellant never testified to any such belief), it could not be used to justify any assaultive response to such provocation because there was, according to the appellant, no assaultive response on his part to that provocation. The appellant testified that after being hit by the fan, <u>he did not hit Ms. G.</u> but "walked out of the room to cool off." *See* <u>State v. Martin</u>, 329 Md. at 361 ("Ordinarily, the source of the evidence of the defendant's state of mind will be testimony by the defendant."); <u>Sims v. State</u>, 319 Md. 540, 553, 573 A.2d 1317 (1990) ("Sims' testimony sheds no light on this because he testified that he was not there."); <u>Thomas v. State</u>, 143 Md. App. 97, 117, 792 A.2d 368 (2002) ("Significantly, appellant never expressed fear for his own safety, nor did he claim, even implicitly that his conduct occurred in a fit of anger or resulted from provocation."); <u>Bynes v. State</u>; 237 Md. App. 439, 446, 186 A.3d 439 (2018) ("That is, generally speaking, something that he, and he alone, must do for himself.").

Ms. G. herself testified that after she hit the appellant with the fan, she quickly went to walk out of the room. She never said that he hit her at that point. This is all the evidence there was on this issue. The appellant had no need for a justifying defense because, according to the testimony of both the appellant and Ms. G., there was no action of his at that point that needed justifying.

**Measuring The Severity Of A Merely Hypothetical Assault**

There is an additional reason that the particular assaultive behavior that the claim of self-defense seeks to justify must be clearly identified. In the multi-factored self-defense paradigm, the fourth of the necessary factors is that:

> the defendant used <u>no more force than was reasonably necessary</u> to defend himself or herself in light of the threatened or actual harm.

Jones v. State, 357 Md. at 422. (Emphasis supplied.)

How do we measure the reasonableness or the excessiveness of an assaultive response if we don't know what the assaultive response actually was? We have no evidence from either of the two witnesses that the appellant responded with violence to being hit with the fan. How then do we measure the degree or intensity of an imagined assaultive response? Was it reasonable? Or was it excessive? How can we measure that if it never happened? What the appellant is asking us to do is to justify some self-defensive countermeasure in the abstract, but it can't be done in the abstract. What the appellant would require us to do is to ignore one of the mandatory factors of self-defense's multi-factored paradigm. What the fourth factor requires is that, even if some self-defensive countermeasures might be permissible in the abstract, it is still limited in terms of intensity or severity to that which is reasonably necessary under the circumstances of the particular case. If the self-defense is only hypothetical, however, how do we measure its intensity? We can't.

The appellant, of necessity, is asking us to hypothesize a generic response to a generic provocation, not an actual response to an actual provocation. How should we do

35

so? In a self-defense scenario, a hypothetical response to provocation need not necessarily be a blow with a clenched fist. Even in the universe of clenched fists, shall we hypothesize an uppercut to the jaw or a rat-tat-tat series of sharp jabs to the nose and mouth? More broadly, why not hypothesize an Othello-Desdemona choking scene or perhaps a vampire-like bite in the neck? How about a body slam that sends the recipient sprawling to the floor or tumbling down the stairs? Or how about a heavy kick to the victim's groin or kneecap? Why not a sharp elbow to the rib cage? Or might the appellant prefer hypothesizing a petulant slap on the wrist?

Our point is that all assaultive responses are not the same. Obviously, this critical criterion – the reasonableness of the response – is rendered meaningless by hypothesizing. We cannot measure the reasonableness or the severity of a merely hypothetical blow. We can only measure the reasonableness or the excessiveness of a particular and actual blow delivered at a certain time and place. If the self-defensive response were only hypothetical, how could we reckon that it was only a small and not unreasonable response? The required analysis requires hard evidentiary facts, of which we have none. The appellant failed utterly to particularize.

## Judge Oesterreicher's Ruling

In declining to give the self-defense instruction, Judge Oesterreicher's reasoning is in full accord with that of this Court. Self-defense is a justification for assaultive behavior. Judge Oesterreicher found that no assaultive behavior had occurred, certainly none in particularized response to having been hit by the fan:

> In this instance, <u>this is not an issue of was assaultive behavior justified. Mr. Mason testified that he did nothing.</u> <u>That he was struck with the fan and he left and went outside to cool down.</u>

(Emphasis supplied.) Her conclusion was accordingly clear:

> So <u>I decline to issue the instruction</u> because he did not – <u>he is not asking the jury to find that his assault of Ms. [G.] was justified.</u> <u>He is asking the jury to find that he did not assault her in any fashion, and therefore, it need not be justified</u> because there was – <u>no act occurred.</u> <u>So I am declining to issue that instruction</u> on those – <u>for those reasons.</u>

(Emphasis supplied.) One cannot justify a non-act.

In responding to just such an absence of hard evidence in <u>Dishman v. State</u>, 352 Md. at 293, the Maryland Supreme Court issued its clear directive:

> [W]here the evidence would not logically support a finding that the defendant committed the offense covered by the instruction, the trial court should not instruct the jury on that offense.

(Emphasis supplied.) We see no abuse of discretion there.

A dangling cause plus, somewhere else, a dangling effect are in themselves meaningless. To enjoy any possible cause-and-effect significance, the two must be linked together in a functional relationship. Here, they were not. A dangling cause plus a dangling effect does not produce a cause-and-effect relationship. A viable claim of self-defense, however, requires a cause-and-effect relationship.

Our analysis of this contention, therefore, concludes as it began. The contention did not make it out of the starting gate. The appellant never identified the act of self-defense he sought to justify. It has nonetheless been provocative food for thought.

37

The appellant's fourth and final contention will not detain us long. It is truly an instance of "Much Ado About Nothing."[7]

When the police arrived at 81 ½ Pennsylvania Avenue on August 15, 2021, they were responding to an emergency 911 call alerting them to a report of domestic violence. It was Corporal DeAngelis who took an initial report from Ms. G., the assault victim. In an almost hysterical state of emotion, Ms. G. reported to Corporal DeAngelis that she had been assaulted by her ex-boyfriend, the appellant Troy Mason. The appellant now complains that that response was hearsay. The appellant further complains that the erroneous admission of that hearsay confirmed the identity of the appellant as her assailant and bolstered the credibility of her later testimony on the stand at trial. The fundamental problem with the contention, quite beyond admissibility, is that any possible prejudice was absolutely inconsequential. It dealt only with matters that were not seriously in dispute.

Before turning to the inconsequentiality of any possible prejudice, it is worth noting that Judge Oesterreicher ruled the hearsay admissible as an excited utterance. At the brief hearing on admissibility, the corporal had testified:

Q.    Corporal, what did you observe about Ms. [G.]?

A.    She had her – she was sitting on the porch. She had redness around
      her chest and neck area. She was rubbing her leg. There was a large
      bump on her leg where her pant leg was rolled up. Her other pant leg
      was down. She was very hysterical. She was crying.

Q.    What do you mean she was hysterical?

---

7      William Shakespeare, "Much Ado About Nothing," 1600.

A. She was crying. She appeared very fearful, and it was hard for her to catch her breath, which is why I requested EMS come without even asking, which typically I ask if they need it. But due to her almost struggling to be able to breathe and calm herself down, I requested EMS.

With that, the court ruled the hearsay admissible as an excited utterance:

MR. DYMEK: Objection

THE COURT: I am going to overrule it now. I think she has satisfied the foundation.

As to the identity of the appellant as Ms. G.'s assailant, that was never in question. As Corporal DeAngelis arrived at the scene to interview Ms. G., Deputy Carbaugh detained the appellant as he was walking towards 81 ½ Pennsylvania Avenue. Asked where he was going, the appellant responded that he was going to the apartment of his ex-girlfriend with whom he had just had an argument. The appellant was visibly bloodied and had a cut on his head.

Ms. G. testified at great length about the lengthy confrontation with the appellant. The appellant himself testified as to the extended confrontation between the two, including Ms. G.'s hitting him in the head with a fan. A nearby neighbor, moreover, James Baker also testified as to separating the appellant from Ms. G., when he found him choking her and physically pulled them apart. He identified the appellant at trial.

With respect to the severity of the appellant's assault of Ms. G., Ms. G.'s testimony was abundantly corroborated. James Baker testified that as he separated the two, the appellant was in the act of choking Ms. G. The anonymous 911 call, moreover, admitted

39

into evidence as an excited utterance, contributed to the severity of the assault: "There's a man beating the shit out of a woman." The woman was Ms. G. The man was the appellant.

We find no error in the admission of the testimony. Even if, purely arguendo, there had been error, we are persuaded beyond a reasonable doubt, that such error would have been harmless. In terms of its content, this fourth contention is absolutely evanescent.

Under the circumstances, it is superfluous even to point out that the appellant failed adequately to preserve this contention for appellate review. Time and time again, this testimony came into evidence without objection. The opposing party must object on each occasion where the challenged evidence is offered by the proponent. Klauenberg v. State, 355 Md. 528, 545, 735 A.2d 1061 (1999); DeLeon v. State, 407 Md. 16, 31, 962 A.2d 383 (2008); Williams v. State, 131 Md. App. 1, 17, 748 A.2d 1 (2000); Maryland Rule 4-323(a). The contention was not preserved for appellate review. If it had been preserved, it utterly lacked any merit.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**